260 P.3d 350

STATE of Hawai'i, Petitioner/Plaintiff–
Appellee

v.

Timothy A. WALSH,
Respondent/Defendant–Appellant.

No. 29790.

Supreme Court of Hawai'i.

Aug. 23, 2011.

274

Peter A. Hanano, Deputy Prosecuting Attorney, County of Maui (Renee Ishikawa Delizo, Deputy Prosecuting Attorney, County of Maui, on the brief), for petitioner/plaintiff-appellee.

Craig Jerome, Deputy Public Defender, for respondent/defendant appellee.

ACOBA, DUFFY, JJ., and Circuit Judge SAKAMOTO, assigned due to a vacancy; with RECKTENWALD, C.J., concurring in the result, with whom NAKAYAMA, J., joins.

1. The opinion was authored by Associate Judge Lawrence M. Reifurth and joined by Presiding Judge Daniel R. Foley. Associate Judge Alexa D.M. Fujise filed a separate concurring opinion.

2. The Honorable Joseph E. Cardoza presided.

Opinion of the Court by ACOBA, J.

We hold that (1) in the criminal trial of a defendant, the prosecution's statements that a testifying defendant "benefitted" from his trial presence and, thus, is less credible because he heard the testimony of other witnesses and heard during voir dire that eye contact with the jurors was an indicator of trustworthiness, constitute prohibited "generic tailoring" arguments; (2) prohibited generic tailoring arguments are reviewable as plain error inasmuch as they affect a defendant's substantial constitutional rights; (3) standard jury instructions regarding witness testimony and counsel's arguments do not cure such improper arguments; (4) accordingly, whenever a defendant testifies, the jury must be instructed that the defendant has a right to be present during trial; and (5) in this case the error is not harmless beyond a reasonable doubt. Based on the reasons set forth herein, we affirm the June 10, 2010 judgment of the Intermediate Court of Appeals (ICA) filed pursuant to its May 26, 2010 published opinion[1] vacating the March 31, 2009 judgment of the Circuit Court of the Second Circuit (the court)[2] adjudging Respondent/Defendant–Appellant Timothy A. Walsh (Respondent) guilty of Assault in the Second Degree, Hawai'i Revised Statutes (HRS) § 707–711(1)(b) (Supp.2008),[3] see State v. Walsh, 123 Hawai'i 284, 231 P.3d 1001 (App.2010), and remand the case for a new trial, consistent with this opinion.

I.

On May 31, 2008, two groups of people were involved in an altercation outside of an all-in-one restaurant, sports bar, and night-club called "Oceans Beach Bar and Grille" (the bar) in Kukui Mall in Kihei, Maui. One group consisted of Respondent, his sister Stephanie Walsh (Stephanie), and friends Lucy Mapson (Lucy) and Ilia Pikaki (Ilia). The other group consisted of Kapena Kramer (Kapena), his brother Iokepa Kramer (Kepa),

3. HRS § 707–711(1)(b) provides that "[a] person commits the offense of assault in the second degree if[ ] ... [t]he person recklessly causes serious or substantial bodily injury to another[.]"

their friend Donald, known as Kala, and other men who were celebrating Kepa's upcoming wedding. Both groups had been drinking alcoholic beverages. Respondent argued with Kala, and Ilia became involved in a fight with Kepa. Kapena attempted to stop the conflict between Ilia and Kepa. At some point, Respondent punched Kapena in the jaw.

## A.

Respondent was present throughout the trial, including voir dire during jury selection.[4] Respondent, Stephanie, Lucy,[5] Kapena, Kepa, two police officers, and John Cooprider, the general manager of the bar, among others, testified at trial. Respondent testified last. The following relevant matters, some verbatim, are adduced from the testimony of witnesses at trial as indicated.

### 1. *Lucy Lei Mapson and Stephanie Marie Walsh*

On the evening in question, Stephanie and Lucy arrived at the bar at approximately 11:30 p.m. They left the bar when it closed, met Respondent and Ilia, and together they headed towards Lucy's car, which was parked near Paradise Photo. On the way to Lucy's car, which was parked in front of the photo shop, Stephanie argued with Respondent. They stopped when males parked in the row behind them started yelling at them. According to Stephanie, Kala "told [Respondent] to shut the F up[,]" and Respondent replied, "[M]ind [your] own business[,]" to which Kala responded, "[S]hut the F up you stupid haole[.]"[6] The males walked towards Respondent, Stephanie, Lucy, and Ilia.

According to Lucy, Kala, who was "angry [and] pumped up," and Respondent then stood "[f]ace to face[ ]" and yelled at each other. Five men attacked Respondent. To defend himself, Respondent "[t]hrew [a] couple [of] punches[ ]" but was backed into a corner. Stephanie was with Respondent and sought to prevent the men from striking him. According to Stephanie, the men took Respondent into a corner and "[p]unched and kicked and stomped on[ ]" Respondent "30 times[,]" and, as a result, Respondent had "bumps on his face[,]" "big lumps" on "the back of his head" and a "black and blue[ ]" mouth. Respondent "curled up in a ball" about 15 feet from the car. He was punched and kicked for three or four minutes. No security guard became involved.

At some point, four men approached Ilia and started attacking him. Lucy attempted to prevent them from doing so, but she was hit in the face and fell to the ground. According to Lucy, the fight between Ilia and the men seemed to last for five minutes.

After the confrontation between Ilia and the other men had tapered off, Respondent escaped from the corner and was in the parking lot near Lucy's car. He was still being punched. At some point, Respondent "slipped out," "ducked under[,] and moved away[,]" to where he was steps away from Ilia and a male who was yelling at Ilia and using his hands to explain a point. Respondent came up to the male, apparently Kapena, and struck Kapena. The male fell and hit Lucy's car. At the time Kapena was struck, other men were continuing to brawl. Lucy did not see any "bouncers" or security guards in the parking lot during the altercation.

Respondent fled and one of the bouncers from the bar held him on the ground. The police arrested Respondent, who, according to Lucy, had blood on his mouth and whose "head was lumped up pretty bad."

### 2. *Kapena Jonah Kramer*

According to Kapena, he, Kepa, Kala, and another friend[7] drank at the bar, left the bar

---

4. A transcript of the voir dire proceedings is not part of the record. Voir dire is a "preliminary examination of a prospective juror by a judge or lawyer to decide whether the prospect is qualified and suitable to serve on a jury." *Black's Law Dictionary* 1710 (9th ed. 2009).

5. Because Lucy and Stephanie testified to a similar version of the events, their testimony are discussed together.

6. "Haole" is a Hawaiian word for a white person or "Caucasian." Mary K. Pukui & Samuel H. Elbert, *Hawaiian Dictionary* 58 (rev. ed. 1986).

7. Kapena stated that approximately ten friends had been at the bar to celebrate Kepa's bachelor party.

when it closed, and headed toward their vehicles in the parking lot. By that time, Kapena was intoxicated, as he had imbibed tequila and eight to nine beers throughout the night. Kala had a "verbal confrontation" with Respondent, who initially was with two females, near the corner of the photo shop. Kala and Respondent fought and wrestled for about five minutes. No staff or security guards became involved.

At the time Respondent and Kala began to clash, Kala was ten to fifteen yards away from Kapena. Shortly after Kala and Respondent began to fight, Kepa, who was standing next to Kapena, became involved in a confrontation with Ilia. This confrontation occurred at the corner of Paradise Photo. Kepa and Ilia fought for about thirty seconds before Kapena stepped in and stopped Kepa from continuing. Kapena recalled that he attempted to calm his brother and Ilia. At that point Kapena had his hands up, indicating that the conflict had ended. Kapena did not recall the location of the females. The next thing Kapena remembered, he was "waking up lying on the ground" near the corner of the photo shop.

### 3. *Kepa Kramer*

Kepa was intoxicated due to his consumption of beers, whiskey, and tequila. When he, Kapena, Kala, and another friend left the bar and headed toward the vehicle in the parking lot, Kepa saw a male and a female arguing. Kepa did not see any security guards or staff near the male and female. One of Kepa's friends asked Respondent, "[W]hy do you have to pick on a girl?" Kepa saw Kala argue and fight[8] with Respondent. Kepa and Ilia began to fight. The altercation between Kepa and Ilia started in the parking lot, and ended on the sidewalk near the corner of the photo shop. Someone pulled Kepa away, and "it was done."

According to Kepa, at that point, no other clashes were occurring. Kepa had begun to walk to his vehicle when Kapena was struck. Kepa did not see what happened but saw

Kapena on the ground. Kepa chased Respondent and hit him in the face and head.

### 4. *Respondent*

Respondent and Ilia met Stephanie and Lucy outside the bar. Respondent, Stephanie, Lucy, and Ilia walked to the car, at which time Respondent argued with Stephanie. When Respondent was in front of Lucy's car, "some guys across the street started yelling[,]" and Respondent "told them to mind their own business[,]" to which one of the men responded, "[S]hut the F up, you stupid haole."

The men approached, and Kala started arguing with Respondent, who put up his hands because he believed Kala was going to attack him. Respondent initially was in front of Lucy's car. He was punched and "everything kind of went black." Respondent "tried to duck and kind of run away," but he was continually "side blinded[.]" He tripped on the curb six feet from the car and fell into the photo shop doorway. Respondent was kicked and struck "at least ten" times during the thirty-to-forty-five seconds he was in the doorway. Stephanie attempted to pull Respondent's attackers away, which allowed Respondent to escape.

Respondent "scrambled out of the doorway[ ]" when he was struck on the back of his head and he fell forward seven to eight feet from Lucy's car. Respondent made an effort to stand, but he was kicked and he "curled up" on the ground. Respondent attempted to leave, and "crawled[ ]" around the car. He "got up and stumbled and just swung a punch."

According to Respondent, he "swung blindly, and just [attempted] to hit whoever was around [him] because [he] was getting attacked." He put his head down and was in a crouched position, and "just swung blindly[.]" Respondent struck Kapena. Respondent struggled to move away but was hit in the back of the head. Respondent sought to defend himself, but the kicking and punching continued. At some point, the police arrested him.

---

8. On cross examination, Kepa changed his story and stated that he "never saw [the fight between Respondent and Kala] get physical."

## 5. *John Cooprider*

According to Cooprider, the bar closes at approximately 1:15 a.m. Once customers leave, they may socialize in the parking lot. Bar employees attempt to clear the parking lot to "make sure no one is stumbling, . . . fighting, [or] drinking[.]" Cooprider's duties included overseeing activities and ensuring people were safe, and not "over intoxicated." If patrons are stumbling and intoxicated, Cooprider and his staff find them a taxi or a ride home.

That night, everyone was out of the bar by 1:30. Cooprider walked, with another security guard, across the parking lot to the corner of Paradise Photo. There, he noticed Kapena and another male standing close to each other and speaking loudly. Kapena was not with a group of people, but "was by himself[ ]" when he was taking with the male. According to Cooprider, the man conversing with Kapena appeared to be with Respondent.

He also noticed a "commotion" among a group consisting of mostly males and security guards twenty yards away from him. Security guards were "trying to get people to leave[,]" as if "there [had been] an altercation[.]" Cooprider did not feel that he had to help because the situation was "under control." Instead, Cooprider turned his attention to the two men having a conversation. Cooprider was five or six feet from them, and although Cooprider was "concerned enough" to pay attention, he did not think their conversation would result in a physical confrontation. According to Cooprider, "it seemed like they were arguing about something" and were "a little passionate," but the males' hands were down at their sides. He did not notice any women.

About thirty seconds later, Cooprider observed Respondent, who was by himself, walk away from the commotion, towards the two men, in a "calm, cool, collective [sic]" manner. Cooprider observed Respondent move to the corner of Paradise Photo. Respondent "did not have any cuts, bruises, [or] bleeding whatsoever[.]" Respondent "walked approximately 30 inches in front of [Cooprider], and [ ] looked over to the left[,] saw [Kapena,] and hit him" "with everything

he had[.]" According to Cooprider, Kapena "did not see [Respondent] coming[.]" In his view, Respondent "blind sided a helpless person."

After Respondent struck the man, he defended himself from approximately fifteen people who "charge[d] him." Cooprider noticed two women defending Respondent and pushing other men off of him. Cooprider and the security guards attempted to intervene, but the fight continued. At one point, Cooprider pulled Respondent off of someone else and put him on the ground.

## 6. *Police officers*

Maui police officers arrived at the scene at approximately 2:00 a.m. By that time, the affray had ended. Kapena was taken to the hospital where he was treated for two fractures. An officer noticed that Respondent had a cut lip and bruises.

### B.

In closing argument, the prosecutor maintained that the "issue" was whether Respondent acted in self defense; Respondent did not act in self defense and the defense witnesses, Respondent, Stephanie, and Lucy, were not credible; particularly, Respondent was not credible because he had been present and heard voir dire and the testimony of other witnesses:

> So, you find out a little bit more about the character of the individual we're talking about.
>
> Well, [Lucy] got CPR training, yada, yada, yada, but she doesn't take the time to dial 911. What was brought up about her on the stand is if you notice, you folks had a chance to see her demeanor. When we're asking about somebody, regardless of the reason why, even if they want to claim self-defense, there's somebody, a boy injured on the ground, knocked out, blood coming out of his head with his jaw busted in two places. How does she react? Doesn't that tell you a lot about the character of the individual?
>
> *Some of you during voir dire and jury selection were asked about what you would look at, and the defense went into great*

detail. *Remember one thing that was asked by me to [Respondent]? You know, [Respondent], first of all, is entitled, since he's on trial here, is entitled to hear and see all the witnesses. But with that becomes the facts [sic] that he's benefitted from seeing all these witnesses. Before he got up on that stand, he saw each and every one of the witnesses, heard what they were going to say.*

*What's important about that is not only that, he heard the voir-diring questions, which some of you had mentioned, I believe you said, well, you know, if they looked me in the eye. Okay, so he gets up here and looks each one of you in the eye. See how sincere I am? Does that mean you're sincere?* Well, what about, you know, Kepa got up there, and he was nervous. Remember Iokepa and Kapena, they had never been in trouble before and never testified before. They get up here. They were nervous. Yeah, think about it. You have to come up here for the first time in this kind of atmosphere, you're going to be nervous.

....

... [W]hy it is important that you remember that testimony that was given to you last week from [Cooprider], the only sober, the only independent witness that was there, what he saw, what axe did he have to grind. We'll get into that.

*But the fact of the matter is it is important that when the [c]ourt has read you those instructions about ... the credibility of witnesses, yes, you take into consideration all those items such as their appearance and demeanor, their manner of testifying,* the intelligence, candor and frankness, the lack thereof, the interest in [sic] bias and motives for testifying, *the opportunity for acquiring information,* the probability or improbability of the witness' testimony[,] the extent to which a witness is supported or contradicted by other evidence and supported [sic] the extent to which a witness gave contradictory

statements and whether at trial or at other times and all other circumstances surrounding it.

*But don't get fooled into a position where somebody can look you in the eye, they must be telling the truth. If you know how to look somebody in the eye, you can still lie.* If we look at the independent witnesses [sic] [Cooprider], what axe did he have to grind? What does he tell you? It corroborates everybody's testimony, even corroborates even [sic] [Respondent's] own testimony. What does [Cooprider] say? He's sitting there. He watches [Respondent], not, oh, crawling on the ground getting up....

(Emphases added.)

Respondent's counsel in part responded to the prosecutor's attack on Respondent's credibility by emphasizing that Respondent had been "upfront" and had "told ... the truth." Respondent's counsel urged the jury not to "speculat[e]" or reach a verdict by "looking at [Respondent] and thinking ... [that Kapena and Kepa] looked a lot nicer[.]" In rebuttal, the prosecutor maintained, among other things, that Respondent "was lying" and, in contrast, "Cooprider did tell ... the full story[.]"

On January 26, 2009, the jury found Respondent guilty.

II.

A.

On appeal to the ICA, Respondent argued, *inter alia,*[9] that the court erred in (1) "allowing the prosecutor to make the constitutionally impermissible argument during closing argument that [Respondent] heard the testimony of all other witnesses and tailored his testimony to match the evidence[,]" and in (2) "allowing the prosecutor to argue that [Respondent's] presence during jury selection allowed him to adapt his manner of testifying based on the jurors' answers during voir dire

---

**9.** Respondent also argued that the prosecutor's statements during closing argument deprived Respondent of his rights to due process and a fair trial, and that the court "plainly erred in failing to instruct the jury that [Respondent] had a con-

stitutional right to be present throughout trial, ... and that the jury must not draw any unfavorable presence based simply on his presence throughout the trial."

in order to appear more credible to the jury." According to Respondent, the statements regarding Respondent's attendance during voir dire and testimony "impermissibly infringed on [Respondent's] constitutional right to be present during the trial ... and had a chilling effect on [Respondent's] right to testify on his own behalf[.]" Petitioner/Plaintiff–Appellee State of Hawai'i (Petitioner or the prosecution) countered that the prosecutor's comments were proper.

Both parties relied on *Portuondo v. Agard,* 529 U.S. 61, 64, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000), which held that a defendant's Fifth,[10] Sixth,[11] and Fourteenth Amendment [12] rights were not violated when the prosecutor, in her summation, highlighted that "the defendant has a benefit and the benefit that he has, unlike all the other witnesses, is ... to sit here and listen to the testimony of all the other witnesses before he testifies." Indeed, the *Portuondo* majority stated that the truth-seeking function of trial is served by the prosecutor commenting on a defendant's "opportunity" to tailor his testimony. *Id.* at 73, 120 S.Ct. 1119.

Justice Stevens concurred, disagreeing with the majority's implicit endorsement of the prosecutor's argument which, in his view, demeaned the truth-seeking function of the adversary process, violated the defendant's individual dignity, and ignored the presumption of innocence. *Id.* at 76, 120 S.Ct. 1119 (Stevens, J., concurring, joined by Breyer, J.). However, Justice Stevens suggested that the states could prohibit such argument or instruct the jury that a defendant had a right to be present at trial:

> The Court's final conclusion, ... that the argument survives constitutional scrutiny does not, of course, deprive States or trial judges of the power *either to prevent such argument entirely or to provide juries with instructions that explain the necessi-*

ty, *and the justifications, for the defendant's attendance at trial.*

*Id.* (emphasis added). Justice Ginsburg dissented, concluding that the majority's holding transformed the defendant's presence at trial "from a Sixth Amendment right into an automatic burden on his credibility[,]" *id.* at 76, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.), and that "[i]n the end, we are left with a prosecutorial practice that burdens the constitutional rights of defendants, that cannot be justified by reference to the trial's aim of sorting guilty defendants from innocent ones, and that is not supported by our case law." *Id.* at 88, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.). The *Portuondo* dissent reasoned that a generic tailoring argument during summation was improper:

> *The prosecutorial comment at issue, tied only to the defendant's presence in the courtroom and not to his actual testimony, tarnishes the innocent no less than the guilty.* Nor can a jury measure a defendant's credibility by evaluating the defendant's response to the accusation, for the broadside is fired after the defense has submitted its case.

*Id.* at 77–78, 120 S.Ct. 1119 (emphasis added).

According to the *Portuondo* dissent, generic tailoring comments occur when the prosecutor uses "the mere fact of the defendant's presence at his trial as the basis for impugning his credibility." *Id.* at 78, 120 S.Ct. 1119. In the dissent's view, a prosecutor, during closing argument, should not be permitted to comment on a defendant's trial presence "where there is no particular reason to believe that tailoring has occurred and where the defendant has no opportunity to rebut the accusation." *Id.* On the other hand, the dissent by Justice Ginsburg would have permitted the prosecutor during sum-

---

**10.** The defendant argued that his Fifth Amendment right to testify on his own behalf was violated. 529 U.S. at 65, 120 S.Ct. 1119.

**11.** The defendant argued that the prosecutor's comments unlawfully burdened his Sixth Amendment rights to be present at trial, to testify on his own behalf, and to be confronted with the witnesses against him. *Id.*

**12.** The defendant argued that because New York law required him to be present at trial, the prosecution violated his right to due process by commenting on that presence. *Id.* at 74, 120 S.Ct. 1119.

mation to make a specific tailoring argument that the defendant tailored "specific elements of his testimony to fit with particular testimony given by other witnesses[.]" *Id.*

Justice Ginsburg noted that several state courts had found it improper for prosecutors to make accusations of tailoring based solely on "the defendant's constant attendance at trial." *Id.* at 83 n. 5, 120 S.Ct. 1119. In sum, according to her, a defendant's Sixth Amendment rights are burdened when a prosecutor, during summation, suggests that the defendant tailored his testimony without pointing to specific facts indicating tailoring. *Id.* at 77, 120 S.Ct. 1119.

Respondent "urge[d the ICA] to reject the holding of the *Portuondo* majority, as its reasoning does not adequately preserve a criminal defendant's right to confrontation[.]" According to Respondent, "[o]ther state courts have addressed this issue and concluded that prosecutorial comments made during closing arguments regarding the presence of criminal defendants during trial do, in fact, infringe upon a defendant's right to confrontation." (Citing *State v. Jones*, 580 A.2d 161, 163 (Me.1990)); [13] *Commonwealth v. Person*, 400 Mass. 136, 508 N.E.2d 88, 90–92 (1987); [14] *Commonwealth v. Elberry*, 38 Mass.App.Ct. 912, 645 N.E.2d 41, 42–43, *cert. or review denied*, 419 Mass. 1107, 646 N.E.2d 1071 (1995); [15] *State v. Hemingway*, 148 Vt. 90, 528 A.2d 746, 747–48 (1987); *State v. Johnson*, 80 Wash.App. 337, 908 P.2d 900, 903 (1996).[16] Petitioner countered that Portuondo was "consistent with Hawai'i case law."

13. In *Jones*, the prosecutor during closing argument stated that "[the defendant] *had the benefit of knowing* what everybody else said before he testified. What opportunity did that give [the defendant] to testify as he did?" 580 A.2d at 162 (emphasis added). The Maine Supreme Court held that the comment infringed on the defendant's right to confront witnesses and be present at trial, stating, "A direct comment by the prosecutor that invites the jury to draw an adverse inference from the defendant's presence at trial and his corresponding opportunity to hear all the witnesses testify is error." *Id.* at 163.

14. In *Person*, the defendant's attorney, during summation, argued that there were several deficiencies in the prosecutor's case. During summation, the prosecutor questioned whether "it [is] just a little bit odd that after sitting here for six days and listening to all the testimony[, the defendant] comes in and gives a completely tailored cover story covering every single aspect" of the case. 508 N.E.2d at 90. According to *Person*, the statement was improper because a defendant is entitled to hear the evidence and confront the witnesses against him. *Id.* Although the defense criticized the prosecution's case, the prosecutor was not "justified in making th[e] argument." *Id.* at 90–91.

15. In *Elberry*, the prosecutor in his closing argument stated that inconsistencies in stories were natural among witnesses who had not lied and who had not heard one another's testimony. 645 N.E.2d at 42. The prosecutor then emphasized,

Did any of the witnesses have the opportunity to see exactly how every other witness testified in this case and then tailor their testimony to that evidence? Some of you are shaking your heads. One person did, one witness did, one witness saw every other person testify, the defendant (pointing).

*Id.* Defense counsel objected, and the court gave a curative instruction. *Id.* at 43. The Appeals Court of Massachusetts, relying on *Person*, held that the prosecutor's remark was "out of bounds and should not have been made[,]" but the curative instruction, to which no party objected, "disposed of the matter." *Id.*

16. *Johnson* noted that a prosecutor's comments that the defendant had a "unique opportunity to be present at trial and hear all the testimony against him" impermissibly infringed on the defendant's Sixth Amendment rights under the United States Constitution. 908 P.2d at 903. No state constitutional issues were raised in *Johnson*. *Id.* at 902 n. 1. "*Portuondo* effectively overrule[d] *Johnson[.]*" *State v. Miller*, 110 Wash.App. 283, 40 P.3d 692, 693 (2002). However, where tailoring questions were asked during cross examination, the Washington Supreme Court determined that "suggestions of tailoring are appropriate during cross-examination[.]" *State v. Martin*, 171 Wash.2d 521, 252 P.3d 872, 879 (2011). The *Martin* dissent maintained that "all accusations of tailoring at any stage of the trial, including cross-examination and summation," should be prohibited. *Id.* at 884 (Sanders, J., dissenting); *see id.* at 883 (explaining that tailoring arguments "afford no meaningful protection of a criminal defendant's constitutional" rights, and prohibiting them allows the jury to " 'draw its own reasonable inferences based on the evidence, rather than rely, even in part, on accusations that the defendant was able to shape his testimony simply because [the defendant] was present, as he had a right to be, at his own trial[]' " (quoting *State v. Mattson*, 122 Hawai'i 312, 343, 226 P.3d 482, 499 (2010) (Acoba, J., dissenting, joined by Duffy, J.))). The concurrence "agree[d] with the dissent that ... [the Washington Constitution] does not permit the State to suggest the defendant has tailored his testimony[,]" but agreed with the majority's re-

## B.

After the briefs were submitted, this court decided *Mattson*, which addressed the application of *Portuondo* in this jurisdiction. The *Mattson* majority essentially adopted the reasoning of Justice Ginsburg's dissent in *Portuondo* and held that, "it would be improper under article I, section 14 of the Hawai'i Constitution, for the prosecution to make generic accusations during closing argument that a defendant tailored his testimony based solely on the defendant's exercise of his constitutional right to be present during the trial." 122 Hawai'i at 326, 226 P.3d at 496. In line with the *Portuondo* dissent, the majority said generic tailoring accusations "cannot sort those who tailor their testimony from those who do not, much less the guilty from the innocent." *Id.* (internal quotation marks and citation omitted). Moreover, generic tailoring arguments "disregard the truth-seeking purpose of a trial inasmuch as generic accusations of tailoring do *not* aid the jury in any way in determining whether a defendant has tailored his testimony or simply related a true version of the events." *Id.* (emphasis in original).

According to the majority, the prosecutor in *Mattson* did not make a generic tailoring argument. In *Mattson*, two witnesses testified that the defendant had threatened an individual with a knife. *Id.* at 315–17, 226 P.3d at 485–87. A 911 recording of a phone call of one of the witnesses explaining that the defendant was "pulling a knife" on another person was "admitted into evidence" and played for the jury at trial. *Id.* at 317 n. 4,

226 P.3d at 487 n. 4. The defendant had previously told the police that he held a lighter during the incident. *Id.* at 320, 226 P.3d at 490. Contrary to the statement to the police and similar to the witnesses' testimony, at trial, the defendant testified that he held an unopened knife during the incident but had not used it in a threatening manner. *Id.* at 319–20, 226 P.3d at 489–90. He also explained that he had "made up" part of the story he had told the police because he "only wanted to make the statement that help[ed] him]." *Id.* at 320, 226 P.3d at 490 (brackets in original). During summation, the prosecutor emphasized that the defendant's trial testimony contradicted the defendant's prior statement to the police and the testimony of other witnesses:

> *He told you he lied before. He had a chance to sit through the evidence. He had to make his story gibe [sic] with what you've heard.* What is in evidence.... *He sat through the evidence.* There is a 911 tape. [A witness's] statement. [Another witness's] statement. Based on all that, he is not telling the truth. *All of a sudden he remembered that he grabbed that knife.*

*Id.* (some emphases added, some emphases in original). According to the *Mattson* majority, because the prosecutor "identified and relied upon specific evidence adduced at trial" in addition to the defendant's presence when attacking the defendant's credibility, the prosecutor did not improperly argue the defendant "tailored his testimony based *solely* on his presence at trial." [17] *Id.* at 327, 226 P.3d at 497 (emphasis in original).

---

sult because the error was harmless. *Id.* at 880 (Stephens, J., concurring in part and dissenting in part, joined by Chambers and Fairhurst, JJ.).

**17.** The concurrence herein contends that *Mattson* prohibited only "bare accusation[s]" or argument in the form of "[h]e was here, therefore he tailored[.]" Concurring opinion at ——, 260 P.3d at 385. Respectfully, we disagree with this narrow characterization of *Mattson*. *Mattson* forbade accusing a defendant of tailoring because his presence was "conduct as consistent with innocence as with guilt," and such an argument would not help the jury "in determining whether a defendant has tailored his testimony or simply related a true version of the events." 122 Hawai'i at 326, 226 P.3d at 496. Moreover,

the *Mattson* majority was "persuaded by the reasoning of the *Portuondo* dissent[,]" *id.*, which maintained that a prosecutor may not argue that a defendant's testimony, "consistent with [the] other evidence in the case[,]" was due to his presence, 529 U.S. at 77, 120 S.Ct. 1119, because "[t]he implication of th[at] argument seems to be that the more a defendant's story hangs together, the more likely it is that he is lying[,]" *id.* at 79 n. 1, 120 S.Ct. 1119, an argument that does not help to "distinguish the guilty from the innocent[,]" *id.* at 79, 120 S.Ct. 1119. By stating that generic tailoring only occurs when it is asserted that the defendant tailored his testimony because "[h]e was here," the dissent restricts, and unduly confines, *Mattson* and the objection to generic tailoring.

## C.

In a similar vein as the majority, the *Mattson* dissent noted that generic comments "debase the 'truth-seeking function of the adversary process,' violate the 'respect for the defendant's individual dignity,' and ignore 'the presumption of innocence that survives until a guilty verdict is returned[.]'" *Id.* at 340, 226 P.3d at 510 (Acoba, J., dissenting, joined by Duffy, J.) (quoting *State v. Daniels*, 182 N.J. 80, 861 A.2d 808, 819 (2004) (quoting *Portuondo*, 529 U.S. at 76, 120 S.Ct. 1119 (Stevens, J., concurring, joined by Breyer, J.))).[18] The dissent explained that a generic tailoring argument occurs when "a prosecutor states that the defendant was able to sit through the trial and hear the testimony of other witnesses, thereby allowing the defendant the opportunity to shape his or her testimony to fit that of other witnesses, even when there is no evidence that defendant has actually done so." *Id.* at 336, 226 P.3d at 506. Thus, while a prosecutor may cast doubt on the substance of a defendant's testimony, "where the exercise of constitutional rights is 'insolubly ambiguous' as between innocence and guilt, a prosecutor may not unfairly encumber those rights by urging the jury to construe the ambiguity against the defendant." *Id.* at 338, 226 P.3d at 508 (quoting *Portuondo*, 529 U.S. at 77, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.)).

Hence, generic tailoring comments on summation "suggesting that a defendant tailored his testimony inverts those rights, permitting the prosecutor to punish the defendant for exercising that which the Constitution guarantees." *Id.* at 340, 226 P.3d

at 510.[19] (internal quotation marks, citation, and emphasis omitted). Additionally, "[a]lthough the constitutional right to confront witnesses should be sufficient to justify a rule barring accusations of tailoring, the additional fact that Hawai'i Rules of Penal Procedure (HRPP) Rule 43 (2008) mandates defendants ... to be present at all stages of the trial further compels prohibiting such accusations."[20] *Id.* at 329, 226 P.3d at 499. The *Mattson* dissent explained that "a specific tailoring argument is made when the prosecution alludes to facts indicating that a defendant has tailored specific elements of his testimony to fit with particular testimony given by other witnesses." *Id.* at 336, 226 P.3d at 506 (internal quotation marks, brackets, and citation omitted).

In sum, the prosecution should be prohibited from "referring to the fact that the defendant was in the courtroom or that he heard the testimony of other witnesses, and was thus able to tailor his testimony." *Id.* at 328, 226 P.3d at 498 (internal quotation marks and citation omitted). Consequently, in *Mattson*, "the prosecutor's general statements directly attacking [the defendant's] presence at trial, and his concomitant ability therefore to make his story gibe [sic] wrongly infringed on [the defendant's] rights to be present at trial and to testify." *Id.* at 341, 226 P.3d at 511 (internal quotation marks omitted).

## III.

Following the rule established in *Mattson*, the ICA majority in this case found the prosecutor's remarks were "a generic accusation" that Respondent tailored his testimony

---

**18.** The *Mattson* dissent would have held that "all accusations of tailoring at any stage of the trial, including cross examination and summation, impermissibly burden a defendant's right to be present at trial and to confront witnesses against him." 122 Hawai'i at 329, 226 P.3d at 499 (Acoba, J. dissenting, joined by Duffy, J.).

**19.** With respect to a prosecutor's specific tailoring remarks during summation, the *Mattson* dissent noted that allowing such comments "afford no meaningful protection of a criminal defendant's constitutional right to confrontation." *Id.* at 343, 226 P.3d at 513. As it is permissible for a prosecutor to "state, discuss, and comment on the evidence as well as draw all reasonable infer-

ences" therefrom, it is unnecessary to allow comment on the defendant's trial presence in connection with remarks on the evidence during summation. *Id.* at 345, 226 P.3d at 515 (internal quotation marks and citation omitted).

**20.** HRPP Rule 43(a) generally provides that in felony cases "[t]he defendant shall be present at the arraignment, at the time of the plea, at evidentiary pretrial hearings, *at every stage of the trial including the impaneling of the jury* and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule." (Emphasis added.)

because they did not "reference any evidence and relate[d] only to [Respondent's] presence in the courtroom." *Walsh*, 123 Hawai'i at 289, 231 P.3d at 1006. According to the ICA majority, the prosecutor "drew attention to [Respondent's] presence during witness testimony and jury *voir dire*, emphasized that [Respondent] had heard all of the testimony prior to testifying himself, and implied that [Respondent] tailored his testimony to appear more credible." *Id.* While the prosecutor did not explicitly state that Respondent tailored his testimony, according to the ICA, the "implication of the prosecutor's argument . . . was such that the jury was left with the inescapable conclusion that because [Respondent] exercised his right to be present during jury *voir dire* and other witnesses' testimony, he was tailoring his testimony." *Id.* Thus, the ICA vacated the judgment and remanded the case.

Although the ICA majority analyzed the prosecutor's comments as a whole, the concurrence reasoned that some of the prosecutor's comments were proper and some were not. The concurrence agreed that the prosecutor's remarks that Respondent "benefitted from seeing all these witnesses[ ]" because "[b]efore he got up on that stand, he saw each and every one" of them, were improper because they were not "premised on any evidence presented during trial to support the inference that [Respondent] had tailored his testimony based on what he had heard." *Id.* at 290–91, 231 P.3d at 1007–08 (Fujise, J., concurring).

■ However, the concurrence maintained the prosecutor made the "separate point[ ]" that Respondent, "having heard some of the jurors state that they took eye contact as

indicative of truthfulness[,] actually took their cue and looked at the jurors during his testimony." *Id.* at 291, 231 P.3d at 1008.[21] According to the concurrence, because the "jurors heard the responses given during voir dire and witnessed [Respondent's] trial testimony[,]" "they were in the best position to judge whether [Respondent] tailored his comportment to their comments[.]" *Id.* However, the concurrence apparently agreed the case should be remanded for a new trial based on the prosecutor's remarks referring to Respondent's "benefit" of being present during the testimony of other witnesses.

### IV.

Petitioner applied for certiorari, asking

[w]hether the ICA gravely erred when it held, that the prosecutor's comments during closing argument, implying that [Respondent] tailored his testimony to be more credible after being present at jury voir dire and during other witnesses' testimony, constituted plain error and thus, violated [Respondent's] State of Hawai'i Constitutional right to be present during trial.

### V.

In support of the question presented in its Application, Petitioner argues that (1) the alleged improper comments did not constitute plain error affecting Respondent's substantial rights; (2) the prosecutor "did not rely solely on [Respondent's] exercise of his right to be present at trial[,]" but referred to "specific evidence adduced at trial" and a jury instruction regarding the credibility of

---

**21.** Respectfully, there is no evidence that Respondent "actually" "took [the juror(s)] cue," assuming that there was such a "cue." 123 Hawai'i at 291, 231 P.3d at 1008. Nowhere in the record is this matter noted or discussed. "It is very difficult for an appellate court to review an issue that is not grounded in the record." *United States v. Schuler*, 813 F.2d 978, 980 (9th Cir.1987). Thus, *Schuler* aptly advised, "[i]f counsel considers such an [action] to be significant, he or she should ask the trial court to have it included in the record." *Id.*

The principle that appellate review requires a complete record of the events relied upon is salutary and well-established, irrespective of

whether the demeanor challenged on appeal was that of a witness on the stand or that of a witness off the stand, or whether the case was a criminal or civil one. Consequently, if a litigator seeks appellate review based on particular "demeanor" that occurred during trial, when there is no record that such occurred, it is not unexpected that it would be "very difficult for an appellate court to review an issue that is not grounded in the record[.]" *Schuler*, 813 F.2d at 980. In that circumstance, there can be no reasonable expectation that the occurrence itself will be unquestionably accepted for purposes of appellate review.

witnesses, and, therefore, the statements were permissible under *Mattson;* (3) the prosecutor's comments that Respondent tailored his demeanor based on juror answers during voir dire were not improper because they were an attempt to discredit the manner in which Respondent testified; (4) the jury did not dismiss Respondent's testimony based on an implication of tailoring; and (5) "although the issue in this case was the credibility of the witnesses, the evidence against [Respondent] indicating that [Respondent] recklessly caused substantial bodily injury to [Kapena] was overwhelming."

## VI.

### A.

■ Petitioner's first argument that the ICA gravely erred by reviewing the statements under plain error is incorrect because the statements affected Respondent's constitutional rights to confront witnesses, to be present at trial, to testify, and to a fair trial. *See State v. Miller,* 122 Hawai'i 92, 100, 223 P.3d 157, 165 (2010) (noting that, if error in the proceedings adversely affected the substantial rights of the defendant, the error is plain error). It is established that, under the plain error doctrine, "where plain error has been committed and substantial rights have been affected thereby, the error may be noticed even though it was not brought to the attention of the trial court." *Id.* (internal quotation marks and citation omitted); *see* HRPP Rule 52(b) (2008) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *State v. Wakisaka,* 102 Hawai'i 504, 513, 78 P.3d 317, 326 (2003) ("If defense counsel does not object at trial to prosecutorial misconduct," "[w]e may recognize plain error when the error committed affects substantial rights of the defendant.") (Internal quotation marks and citations omitted.). Moreover, this court will apply the plain error standard of review "to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental

rights." *State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998).

■ "The purpose of plain error is to allow the court to vindicate substantial rights and to uphold the integrity of the judicial system, regardless of the venue in which the appellant failed to present the argument." *Miller,* 122 Hawai'i at 119–20, 223 P.3d at 184–85. This court's ability to review for plain error stems from its inherent power to recognize such error *sua sponte. Id.* at 122 n. 31, 223 P.3d at 187 n. 31. Of course, we can employ the power to review an error that allegedly affects substantial rights, but upon such review conclude that no error had occurred. *Id.*

### B.

■ In holding that it is improper for the prosecution "to make generic" tailoring accusations during closing argument, 122 Hawai'i at 326, 226 P.3d at 496, *Mattson* emphasized that "upholding a defendant's rights under the confrontation clause is essential to providing a defendant with a fair trial[ ]" and that "a prosecutor's comments may *not* infringe on a defendant's constitutional rights[,]" *id.* at 325, 226 P.3d at 495 (emphasis in original). The right of confrontation is a substantial right. *See State v. Kassebeer,* 118 Hawai'i 493, 516, 193 P.3d 409, 432 (2008) (holding that prohibiting a complainant from answering a defendant's question "inhibited [the defendant] from confronting the complainant" and therefore "adversely affected his substantial right to confrontation[ ]"). The "confrontation right provides the criminal defendant with the opportunity to defend himself [or herself] through our adversary system by prohibiting ex parte trials, granting the defendant an opportunity to test the evidence in front of a jury, and guaranteeing the right to face-to-face confrontation." *Mattson,* 122 Hawai'i at 325, 226 P.3d at 495 (quoting *State v. Apilando,* 79 Hawai'i 128, 132, 900 P.2d 135, 139 (1995) (brackets in original)) (other citation omitted).

■ Generic accusations of tailoring also "discourage a defendant from exercising his

constitutional right to testify [22] on his own behalf." *Id.* at 326, 226 P.3d at 496. This court, based on an independent review of the record, has held that "[b]ecause the circuit court's error infringed upon [the defendant's] constitutional right to testify, we address it as plain error." *State v. Staley*, 91 Hawai'i 275, 286, 982 P.2d 904, 915 (1999); *see also Wakisaka*, 102 Hawai'i at 516, 78 P.3d at 329 (holding that prosecutor's comment on the defendant's failure to testify constituted plain error affecting the defendant's substantial rights).

■■■■ Additionally, "[i]t is well settled that an accused has a fundamental right to be present at each critical stage of the criminal proceeding." *Onaka v. Onaka*, 112 Hawai'i 374, 380, 146 P.3d 89, 95 (2006) (citations omitted). "The right of a criminal defendant to be present at his trial is of no less than constitutional magnitude, and is founded upon the Confrontation and Due Process clauses of both the United States and Hawai'i Constitutions." *State v. Okumura*, 58 Haw. 425, 427, 570 P.2d 848, 851 (1977). It is a right of "fundamental importance[.]" *State v. Caraballo*, 62 Haw. 309, 320, 615 P.2d 91, 99 (1980).[23]

■■ Finally, the right to a fair trial is a substantial right for which this court has reviewed alleged violations of plain error. *State v. Rapoza*, 95 Hawai'i 321, 326, 22 P.3d 968, 973 (2001) (noting that an erroneous jury instruction that has affected the "defendant's substantial right[ ]—to wit, his or her constitutional right[ ] to a trial by an impartial jury . . .—may be recognized as plain error"); *State v. Marsh*, 68 Haw. 659, 661, 728 P.2d 1301, 1303 (1986) (concluding that the prosecutor's conduct impacted the defendant's "right to a fair trial as to amount to 'plain error' "). Because fundamental rights are infringed when generic tailoring arguments are made, generic tailoring arguments are subject to plain error review.

### C.

■■ In support of its first argument, Petitioner maintains that the prosecutor's statements did not "expressly" accuse Respondent of tailoring, and, therefore, the ICA extended *Mattson* to "tailoring by implication." But there are no specific words or phrases that must be employed to accuse a defendant of tailoring. In *Mattson*, this court found the prosecutor "made an accusation that [the defendant] tailored his testimony to the evi-

---

**22.** The right of a defendant to testify is guaranteed by sections 5, 14, and 10 of article I of the Hawai'i Constitution. *Tachibana v. State*, 79 Hawai'i 226, 231, 900 P.2d 1293, 1298 (1995). The right is "essential to due process of law" as guaranteed under section 5 of article 1. *Id.* (internal citation omitted). The right to testify is also guaranteed through the compulsory process clause of section 14, which states in pertinent part that the accused shall "have compulsory process for obtaining witnesses in the accused's favor[.]" Haw. Const. art. 1, § 14. "Logically included in the accused's right to call witnesses . . . is a right to testify himself, should he decide it is in his favor to do so[,]" since "the most important witness for the defense in many criminal cases is the defendant himself." *Rock v. Arkansas*, 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). The opportunity to testify is a necessary corollary to the guarantee, under section 10, against compelled testimony since every criminal defendant is privileged to testify in his or her defense. *Tachibana*, 79 Hawai'i at 231, 900 P.2d at 1298.

**23.** Other jurisdictions have held that the right to be present is a fundamental or substantial right. *See Rushen v. Spain*, 464 U.S. 114, 117, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (stating that the "right to personal presence at all critical stages of the trial" is a fundamental right of a criminal defendant); *see also People v. Wilkinson*, 185 Cal.App.4th 543, 110 Cal.Rptr.3d 776, 781 (2010) (noting that an attorney cannot "authorize relinquishment of substantial rights, such as the right to be present, without the client's consent"); *State v. Calderon*, 270 Kan. 241, 13 P.3d 871, 879 (2000) (articulating that the "right to be present at one's criminal trial is a fundamental right[ ]"); *People v. Mallory*, 421 Mich. 229, 365 N.W.2d 673, 681 n. 10, 682 (1984) (explaining that a defendant has a right to be present during any stage of trial where his substantial rights might be adversely affected); *State v. Finnegan*, 784 N.W.2d 243, 255 (Minn.2010) (defining the right to be present at trial as a fundamental right); *State v. Muse*, 967 S.W.2d 764, 766 (Tenn.1998) ("The right of an accused to be present at his own trial is a fundamental trial right."); *but see People v. McLaurin*, 235 Ill.2d 478, 337 Ill.Dec. 221, 922 N.E.2d 344, 352 (2009) (noting that the right to be present at trial "is not itself a substantial right under the Illinois Constitution[,]" but a "lesser right[,]" the observance of which is a means to securing the substantial rights of a defendant") (internal quotation marks and citations omitted).

dence presented when she argued that '[h]e had to make his story gibe [sic] with what you've heard.' " 122 Hawai'i at 327, 226 P.3d at 497 (brackets in original). Courts have found generic tailoring arguments based on a wide range of comments, not all expressly arguing that the defendant engaged in tailoring.

In *Jones,* 580 A.2d at 162, the prosecutor stated:

> I suggest when you evaluate the credibility of these witnesses and their testimony you also consider something very important; the only witness who testified in this case who heard everybody else's testimony before he gave his reason was the defendant. [The defendant] had the benefit of knowing what everybody else said before he testified. What opportunity did that give [the defendant] to testify as he did?

Because these comments were "tied only to the defendant's presence in the courtroom and not to his actual testimony[,]" *Portuondo,* 529 U.S. at 77, 120 S.Ct. 1119 (Ginsburg, J., dissenting), they invited "the jury to draw an adverse inference from the defendant's presence at trial and his corresponding opportunity to hear all the witnesses testify[,]" *Jones,* 580 A.2d at 163.

In *Hart v. United States,* 538 A.2d 1146, 1149 (D.C.C.A.1988), the prosecutor during rebuttal "suggested that [the defendant's] testimony was fabricated[ ]" by stating:

> Does that appear ridiculous? ... [T]he most amazing thing happened ... during the course of [the defendant's] testimony. He started rapping and telling the story ... just popping into his head as he was going along.... He sits there and then he says the most incredible thing.... Does that make any sense? ... Does that sound like a person telling the truth? Gets on the stand and tells the truth? You will have to decide that.... Would you bank on that story?

According to *Hart,* "[t]he likely inference from the prosecutor's remarks in [that] case

was that he believed [ ] [the defendant's] testimony was fabricated[,]" which was "especially troubling" because of the prosecutor's "reference to [the defendant's] listening to other testimony at trial." *Id.*

Similar to *Jones* and *Hart,* here, the prosecutor accused Respondent of tailoring his testimony when, in discussing credibility, she argued that Respondent "benefitted" from hearing the testimony of the other witnesses before he testified. Manifestly the prosecutor's remarks drew "the jury's attention to [Respondent's] presence at trial and his resultant opportunity to tailor his testimony[,]" *Martinez v. People,* 244 P.3d 135, 141 (Colo. 2010), and submitted to the jurors that Respondent was less believable as a result. As in *Portuondo,* the prosecutor encouraged the jury to draw from the *"fact"* of the defendant's opportunity to testify, the *"inference"* that he had actually tailored his testimony. 529 U.S. at 86 n. 6, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.) (emphases in original). The prosecutor's comments in the instant case that Respondent "benefitted" from his trial presence are nearly identical to the comments that were found by the *Portuondo* dissent to be unconstitutional and improper. The prosecutor in *Portuondo* argued that "the defendant has a *benefit* and the *benefit* that he has[ ] [is that] he gets to sit here and listen to the testimony of all the other witnesses before he testifies." *Id.* at 64, 120 S.Ct. 1119 (emphases added).

It also cannot be disputed reasonably, as the ICA majority said, that "the prosecutor's argument[ ] ... was such that the jury was left with the inescapable conclusion that because [Respondent] exercised his right to be present during ... other witnesses' testimony, he was tailoring his testimony." *Walsh,* 123 Hawai'i at 289, 231 P.3d at 1006. The contention that Respondent benefitted from listening to all the other witnesses before testifying plainly conveyed to the jury that Respondent's testimony therefore should be discredited.[24] Inasmuch as the comments that Respondent had benefitted were based

---

24. Hence, under the circumstances, it was not necessary that the prosecution also argue that Respondent was able to think about "what [he was] going to say" and how he would "fit [his testimony] into the evidence[,]" *Portuondo,* 529

U.S. at 64, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.), or that Respondent had to make his story "gibe," [sic] as in *Mattson,* 122 Hawai'i at 327, 226 P.3d at 497.

"solely" on Respondent's presence at trial, they were generic tailoring comments prohibited by *Mattson*.[25]

## VII.

Petitioner's second argument contends the prosecutor "did not rely solely on [Respondent's] exercise of his right to be present at trial[,]" but (1) "included references to specific evidence adduced at trial," when she "immediately argued why the jury should believe [Kapena and Kepa] over [Respondent,]" subsequently argued that Cooprider was credible, and tried to "discredit" Respondent, and (2) reminded the jury of the standard jury instruction on evaluating witnesses.

## A.

The prosecutor's closing argument built upon the contention that Respondent was less credible because of his attendance. Immediately after stating that Respondent "benefitted" from his presence by hearing the witnesses, the prosecutor continued,

"[w]hat's important about that[, i.e., Respondent's presence,] is ... [that] he heard [ ] voir-dir[e]" where allegedly it was mentioned that a witness appears credible by maintaining eye contact with the jurors. According to the prosecutor, although Respondent supposedly "look[ed] each one of [the members of the jury] in the eye[,]" and appeared "sincere[,]" Kepa and Kapena, who had "never testified before[ ]" and were "nervous" and "inexperienced testifiers," actually "told it like it was." The prosecutor differentiated Respondent from Kepa and Kapena, suggesting that Respondent may have appeared "sincere" because of information gained through other witnesses' testimony and voir dire.[26] By contrasting Respondent from other witnesses because of his trial presence, the prosecutor assailed Respondent's exercise of his constitutional rights, and "disregard[ed] the truth-seeking purpose of a trial" inasmuch as the "generic accusations of tailoring d[id] not aid the jury in any way in determining whether [Respondent] ... tailored his testimony or simply related a true version of the events."[27] *Mattson*, 122 Ha-

25. Although the concurrence agrees that the prosecution's statement regarding Respondent's "benefit[ ]" is improper generic tailoring under *Mattson*, it maintains that such a conclusion is "dispositive," and, therefore, the remainder of the prosecutor's closing argument need not be discussed. Concurring opinion at ——, 260 P.3d at 380. However, as shown in part VII, the prosecutor's entire closing argument, including the prosecution's argument that Respondent maintained eye contact with jurors because he heard during voir dire that such conduct is indicative of credibility, is part and parcel of the prosecutor's argument that Respondent benefitted from being at trial. Moreover, inasmuch as the case is remanded for retrial, this issue must be addressed to avoid a similar argument being raised at the new trial.

26. The concurrence characterizes the voir dire argument as made "in the context of a larger argument regarding the credibility of the witnesses, and in particular, their demeanor while testifying." Concurring opinion at —— – ——, 260 P.3d at 380. According to the concurrence, the prosecutor "sought to dispel the notion that the jurors should accordingly find [Respondent's] testimony credible, by (1) suggesting that [Respondent] may have testified in that manner in order to appear sincere, and (2) comparing [Respondent's] demeanor on the stand to that of the State's witnesses." *Id.* at ——, 260 P.3d at 380. But, according to the prosecutor, Respondent purportedly adopted a sincere "manner" because he was present when jurors identified such a

"manner" as credible. Likewise, the "comparison" that Respondent exhibited a false appearance of sincerity because he had been present throughout the proceedings, whereas Kapena and Kepa appeared nervous due to the fact that they had never testified before and had not been present, improperly made "[Respondent's] presence at trial an automatic burden on his credibility." *Mattson*, 122 Hawai'i at 323, 226 P.3d at 493 (internal quotation marks and citation omitted). Thus, it is plain that the voir dire reference improperly relies on Respondent's presence.

27. The concurrence maintains that the "truth-seeking function[ ]" of the jury was furthered by "focusing the jury's attention on ... [Respondent's] demeanor[,]" and providing an explanation for Respondent's demeanor "based on more than" his presence throughout trial. Concurring opinion at ——, 260 P.3d at 380. Respectfully, the concurrence provides no authority for its statement. Insofar as the prosecutor's explanation for Respondent's demeanor was based purely on Respondent's attendance at trial, it is difficult to discern how that function is furthered. To reiterate, "[a] trial ideally is a search for the truth," but that search is not advanced when a prosecutor accuses a defendant during closing argument of tailoring his testimony based on his presence, inasmuch as a jury is not aided thereby in sorting the "guilty from the innocent[,]" or in evaluating the "defendant's credibility[.]" *Portuondo*, 529 U.S. at 77, 120 S.Ct. 1119 (Ginsburg,

wai'i at 326, 226 P.3d at 496. Respondent's "version of the events," *id.*, was automatically discredited to the extent that it was "tied only to [his] presence" in the courtroom[,] *Portuondo*, 529 U.S. at 77, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.).

### B.

Immediately after arguing that Kapena and Kepa were believable whereas Respondent was not, the prosecutor discussed the standard jury instruction on witness credibility, stating, "But the fact of the matter is that [the jury may consider] the credibility of witnesses, [taking] into consideration all those items such as their appearance and demeanor, their manner of testifying, ... [and] the opportunity for acquiring information[.]" [28] The prosecutor then linked the jury instruction with the previous argument that Respondent lacked credibility because he was present during voir dire by stating, "But don't get fooled into a position where because somebody can look you in the eye,

they must be telling the truth. If you know how to look somebody in the eye, you can still lie." [29]

In doing so, the prosecutor told the jury that even though Respondent may have appeared truthful, Respondent should not be believed because he had employed knowledge about the jury, that he had gained during voir dire. In essence, the prosecutor told the jury to "assess [Respondent's] credibility in [the] light of this improper comment[,]" *Hemingway*, 528 A.2d at 748, thereby infringing on Respondent's exercise of his right to testify, and "detract[ing] from, rather than ensur[ing, Respondent's] ability to obtain a fair judgment[,]" *id.*

■ Following that assertion, the prosecutor's comment, "But John Cooprider tells it like it is[,]" again linked Respondent's presence during voir dire and the testimony of other witnesses with Respondent's lack of credibility, thereby "bolstering" Cooprider's testimony. The prosecution's assertion that Respondent's credibility [30] must be viewed in

---

J., *dissenting, joined by Souter, J.). Additionally, in the instant case, the jury was not aided in determining whether Respondent was guilty or innocent, and could not "measure [Respondent's] credibility by evaluating ... [his] response to the accusation [of tailoring], for the broadside [was] fired after the defense ha[d] submitted its case[,]" inasmuch as the statement came during closing arguments. Id.* at 78, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.) (noting that statements made during summation were improper because the defendant had submitted his case and could not respond).

28. Hawai'i Jury Instructions Criminal (HAWJIC) § 3.09 states as follows:

It is your exclusive right to determine whether and to what extent a witness should be believed and to give weight to his or her testimony accordingly. In evaluating the weight and credibility of a witness's testimony, you may consider the witness's appearance and demeanor; the witness's manner of testifying; the witness's intelligence; the witness's candor or frankness, or lack thereof; the witness's interest, if any, in the result of this case; the witness's relation, if any, to a party; the witness's temper, feeling, or bias, if any has been shown; the *witness's means and opportunity of acquiring information;* the probability or improbability of the witness's testimony; the extent to which the witness is supported or contradicted by other evidence; the extent to which the witness has made contradictory

statements, whether in trial or at other times; and all other circumstances surrounding the witness and bearing upon his credibility.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony. In weighing the effect of inconsistencies or discrepancies, whether they occur within one witness's testimony or as between different witnesses, consider whether they concern matters of importance or only matters of unimportant detail, and whether they result from innocent error or deliberate falsehood.
(Emphasis added.)

29. The prosecutor's reference to the jury instruction did not mitigate any impropriety. The directive in the instruction that the jury can consider the demeanor and appearance of witnesses was undermined by the prosecutor's following warning that the jury should not "get fooled into a position where because somebody can look you in the eye, they must be telling the truth." The jury instruction served only as a platform to state that Respondent's demeanor was feigned based on information received during voir dire. Thus, the prejudicial impact of the argument was exacerbated, not mitigated, by the reference to the jury instruction.

30. It is established that a prosecutor may attack the credibility of a defendant who chooses to testify. *Apilando*, 79 Hawai'i at 149, 900 P.2d at

the context of his trial presence permeated her closing argument. The comments thus "transform[ed Respondent's] presence at trial from a [constitutional] right into an automatic burden on his credibility[.]" *Portuondo*, 529 U.S. at 76, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.).[31]

## VIII.

### A.

■ Petitioner's third argument maintains the prosecutor's argument that Respondent "tailored" his demeanor based on juror answers during voir dire was not improper. In this regard, the ICA concurrence concluded that the prosecutor's argument was proper because it "was not merely a generic accusation of tailoring, but was based on [Respondent's] *actions* after he witnessed the juror's comments." *Walsh*, 123 Hawai'i at 291, 231 P.3d at 1008 (Fujise, J., concurring) (emphasis added).

■ Ordinarily, juror statements during voir dire are not evidence. *See State v. Ashley*, 22 So.3d 1045, 1059 (La.Ct.App.2009) ("Jury voir dire is not evidence."); *see also United States v. Khoury*, 901 F.2d 948, 955 (11th Cir.1990) (the district court instructed the jurors "that the statements [by one juror] made during voir dire were not evidence and had nothing to do with the case[ ]"); *Shaw v. State*, No. CR 05–235, 2005 WL 1533548, at *1 (Ark. June 30, 2005) ("Matters discussed during voir dire are not considered evidence."); *Estate of Burton v. Trover Clin-*

*ic Found., Inc.,* —— S.W.3d ——, —— (Ky. Ct.App.2010) ("[I]n light of the instructions given by the court that the jury was to consider the evidence presented at trial, and ... that statements made during opening, arguments during closing, and the questions presented in voir dire are not evidence to be considered by the jury[,]" a party's concerns "over what thoughts might be raised in the minds of the jury by ... questions on voir dire are without sound basis[.]"); *Gillespie v. Wilkinson*, No. 08–1675, 2010 WL 5373931, at *4 n. 19 (E.D.La. Nov.22, 2010) (stating that trial judge explained to the potential jurors that the "voir dire process was not evidence in any way"); *Francis v. Miller*, No. 07–0140–CV–W–ODS, 2007 WL 4178609, at *6 (W.D.Mo. Nov.19, 2007) ("[Q]uestions asked during voir dire are not evidence[.]"); *Brown v. State*, No. 09–09–00137–CR, 2010 WL 3041317, at *5 (Tex.Ct.App. Aug. 4, 2010) (noting that, a potential juror "indicated he understood that what he heard during voir dire was not evidence [inasmuch as] no evidence had been presented yet[ ]"); *cf.* HAWJIC 3.07 ("[T]here are two types of evidence—direct evidence, such as the testimony of witnesses who assert actual knowledge of a fact, and circumstantial evidence, which permits a reasonable inference from the existence of another fact."); HAWJIC 1.01 ("After [the jury has] heard all the evidence in this case and the arguments of counsel, and have received written instructions of the court as to the law that applies[,]" the jury has the duty of determining guilt or innocence and its "decision must be

142 ("This court has held that, when a defendant takes the stand to testify, his or her credibility can be tested in the same manner as any other witness."). In that regard, "[t]he credibility of a witness may be attacked by evidence of bias, interest, or motive." Hawai'i Rules of Evidence Rule 609.1(a) (1993). Thus, a prosecutor may challenge the defendant's credibility by commenting on evidence of bias, interest, or motive. But here, the prosecutor suggested that Respondent was not believable due to his attendance at voir dire and the testimony of other witnesses at trial. Remarking that Respondent has "benefitted" from being at trial, including voir dire, is not a comment on any evidence of bias, interest, or motive.

**31.** According to the concurrence, Respondent could "rebut [Petitioner's] argument during his

own closing, by suggesting that his demeanor was in fact sincere, by contrasting it to the demeanor of other witnesses, or otherwise[,]" concurring opinion at ——, 260 P.3d at 380, and did so, *id.* at ——, 260 P.3d at 385–86. But such a response would only confirm the legitimacy of the generic tailoring argument by Petitioner. The inference that Respondent was less credible as a result of his presence is the very inference the *Portuondo* dissent and *Mattson* condemned. Although Respondent could contrast Respondent's demeanor to that of other witnesses, doing so would do nothing to counter the inference planted by the prosecution that Respondent's demeanor was shaped *because of* his presence, whereas other witnesses appeared honest because they had not been in attendance throughout trial.

based solely on the evidence ... receive[d] in this room and the court's instructions."); HAWJIC 1.02A (noting that the instruction regarding note taking must be given "prior to evidence being presented"); HAWJIC 3.03 (directing the jury to "consider only the evidence which has been presented," "such inferences therefrom as may be justified by reason and common sense[,]" but emphasizing that "[s]tatements or remarks made by counsel are not evidence[,]" and the jury "should consider their arguments" but "are not bound by their recollections or interpretations of the evidence[ ]"). Thus, if Petitioner sought to impeach Respondent through the use of voir dire comments, it should have proffered the comments into evidence.

 As noted before, there is no record of the voir dire of the venire herein.[32] Accordingly, there is no verification of what

was said by potential jurors with respect to eye contact. Inasmuch as the venire's comments were not in evidence, the prosecutor impermissibly commented on matters outside the evidence. A prosecutor is allowed to "state, discuss, and comment on the *evidence* as well as to draw all reasonable inferences from the evidence." *State v. Clark,* 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996) (emphasis added); *see State v. Mainaaupo,* 117 Hawai'i 235, 253, 178 P.3d 1, 19 (2008) ("Although a prosecutor has wide latitude in commenting on the evidence during closing argument, it is not enough that ... his comments are based on testimony 'in evidence'; his comments must also be 'legitimate.' ") (Internal citation omitted.). A prosecutor's comment on matters "outside the evidence" is improper. *State v. Tuua,* 125 Hawai'i 10, 14, 250 P.3d 273, 277 (2011) (holding that, the prosecutor's remarks, hypothesizing on the

**32.** The concurrence maintains that Respondent had the of requesting a transcript of voir dire. Concurring opinion Hawai'i Rules of Appellate Procedure (HRAP) Rule 10(b)(1)(A). first, the purported statements of potential jurors were not evidence but were, nonetheless, relied on by the prosecution Respondent's truthfulness. In that instance the prosecutor incorrectly sought to impeach Petitioner based on statements not in evidence.

Second, the voir dire transcript was unnecessary argument. HRAP 10(b)(1)(A) provides that an appellant, here, Respondent, must "request ... a[ ] transcript of such parts of the proceedings as the appellant [ (Respondent) ] deems *necessary* that are not already on file." (Emphasis added.) In the instant case, Petitioner argued on appeal that the ICA should disregard Respondent's argument concerning voir dire inasmuch as Respondent had not filed a transcript of the voir dire. However, Respondent did not deem the transcript of voir dire "necessary," arguing before the ICA that the juror statements were not evidence and the prosecutor's comments on Respondent's ability "to listen to the jurors[ ]" "did not connect any of its accusations to specific evidence of tailoring at trial[,]" but instead, made a general accusation "that relied on innuendo rather than evidentiary support."

Respondent maintained that "the substantive content of voir dire is entirely irrelevant" inasmuch as the voir dire transcript would "either support or contradict the prosecutor's recollection of the events," which, in either event, "would not affect the validity of [Respondent's] arguments." According to the concurrence, Respondent took the "position[ ]" that he did not dispute the prosecutor's description of voir dire, a position "contrary" to this opinion's assertion *that there was no "verification" of what was said*

during voir dire. Contrary to the concurrence's assertion, Respondent's position was not that he "verif[ied,]" concurring opinion at —— n. 1, 260 P.3d at 380 n. 1, that the prosecution's characterization of voir dire was correct, but that he deemed voir dire to be entirely irrelevant, irrespective of whether the transcript was consistent with the prosecutor's statement, a position that is not "contrary" to the statement that there is no verification of what was said. The ICA majority agreed with Respondent, determining that it was "not the jury voir dire itself, but the prosecutor's comment during closing argument regarding [Respondent's] right to witness jury voir dire[ ]" that was relevant, and therefore, the record of jury voir dire was not necessary. *Walsh,* 123 Hawai'i at 288 n. 2, 231 P.3d at 1005 n. 2.

Finally, the concurrence quotes from *Ek v. Boggs,* 102 Hawai'i 289, 292 n. 3, 75 P.3d 1180, 1183 n. 3 (2003), a civil case where this court declined to address the petitioner-appellant's contention that a circuit court's "prefiling order" requiring the petitioner-appellant to obtain court approval before filing future pleadings was unsupported by the evidence. Concurring opinion at —— n. 1, 260 P.3d at 380 n. 1. This court merely reiterated that it would not address that argument, 102 Hawai'i at 292 n. 3, 75 P.3d at 1183 n. 3, inasmuch as petitioner-appellant failed to include "a transcript" of the evidentiary hearing where "all evidence relevant" to the prefiling order was proffered, HRAP Rule 10(b)(3). In the instant case, Respondent was only required to designate parts of the transcript that were "necessary" to his "point of appeal" before the ICA, HRAP 10(b)(1)(A); a point that did not require a transcript of the voir dire. *See Walsh,* 123 Hawai'i at 288 n. 2, 231 P.3d at 1005 n. 2.

consequences of the verdict, were improper because they commented on matters outside the evidence adduced at trial). Here, the prosecutor discussed statements by potential members of the jury elicited during voir dire that she did not offer in evidence and, thus, did not permissibly "state, discuss, and comment" on what was in evidence. *Clark*, 83 Hawai'i at 304, 926 P.2d at 209.

■■■■■ A defendant's right to be present during voir dire is analogous to a defendant's right to be present during testimony of witnesses, and, thus, a defendant's mere presence during voir dire cannot be used against the defendant to attack his credibility. *Cf. Mattson*, 122 Hawai'i at 314, 226 P.3d at 484

(noting that it is improper to allow a defendant's presence at trial to be used as an attack on his credibility). *Mattson* allows a prosecutor to comment on a defendant's presence in connection with "specific evidence" [33] that the defendant tailored his testimony to the evidence. *Id.* at 327, 226 P.3d at 497. In this case, the prosecutor argued that Respondent shaped his demeanor to appear truthful to the jury, based on statements made by potential jurors regarding credibility.[34] However, inasmuch as the statements were not in evidence, they could not be relied on as "specific evidence" [35] to support the contention that the defendant engaged in tailoring.[36] As with respect to

**33.** The concurrence argues that *Mattson* did not state that only evidence "which is noted in the record" can be used to make a proper tailoring argument, and therefore, it is proper to refer to a defendant's demeanor or jury statements, even if they are not in the record. Concurring opinion at —— n. 4, 260 P.3d at 384 n. 4 (emphasis omitted). However, in *Mattson*, the "specific evidence" that was "adduced at trial" was undeniably in the record. *Mattson*, 122 Hawai'i at 314, 226 P.3d at 484; *see id.* at 314, 317 n. 4, 320, 226 P.3d at 484, 487 n. 4, 490 (noting that the testimony of the witnesses was "evidence adduced at trial"; stating that the 911 tape was "admitted into evidence, [and] was played for the jury at trial, but was not simultaneously transcribed into the record"; and explaining that the prosecutor argued that the defendant sat "through the evidence"). Respectfully, if evidence of a specific nature is not in the record, it would be impossible for an appellate court to review whether there was specific "evidence" of tailoring.

**34.** With all due respect, the concurrence's argument that the voir dire remark in the instant case is "similar" to the argument that was permitted in *Mattson* is incorrect. Concurring opinion at ——, 260 P.3d at 385–86. To reiterate, the *Mattson* prosecutor referred to several items of "specific evidence," in arguing that the defendant tailored his testimony to the evidence presented. 122 Hawai'i at 327, 226 P.3d at 497. Contrastingly, the prosecutor herein did not refer to any evidence suggesting that Respondent actually shaped his demeanor to conform to supposed juror statements, but only referred to his presence during voir dire as being the reason for the alleged tailoring.

**35.** The concurrence agrees that the voir dire statements are not in evidence, concurring opinion at ——, 260 P.3d at 383, but maintains that in the instant case the statements regarding eye contact are not a "type" of information that needed to be entered into evidence insofar as

they "derive[] from common knowledge and experience[,]" to which the prosecutor can "refer" in summation, *id.* at ——–——, 260 P.3d at 383–85. With all due respect, eye contact alone as a measure of credibility is not at issue in this case. What is at issue is the prosecutor's argument that Respondent lacked credibility because his allegedly credible demeanor was derived from his presence at trial during which he supposedly heard jurors refer to credibility traits and had mimicked those traits. In that regard, the prosecutor employed voir dire statements regarding eye contact as evidence that Respondent had an advantage that he gained solely from his presence. The prosecutor's attack on Respondent's credibility due to his presence is at issue, not any "common knowledge" of the jurors. Additionally, *Mattson* requires that, in seeking to attack a defendant's credibility based on his presence during voir dire, a prosecutor must put voir dire statements in evidence, insofar as a prosecutor must refer to specific "evidence", i.e., voir dire statements, indicating a defendant engaged in tailoring to make a tailoring argument. 122 Hawai'i at 327, 226 P.3d at 497.

**36.** The concurrence states that a defendant's demeanor on the stand is "information which both the jury and counsel were able to observe at trial and which the jury can appropriately consider as *evidence* in its deliberations[,]" Concurring opinion at ——, 260 P.3d at 381 (emphasis added), and therefore is not an improper subject of comment, *id.* at ——–——, 260 P.3d at 381–82 (citing many cases for the proposition that a witness' testimonial demeanor is a type of evidence subject to proper comment). Of course, generally, comment on testimonial demeanor is entirely proper. *See infra* note 39.

However, an explanation of the defendant's demeanor simply tied to his observations at voir dire is not a proper ground upon which to attack credibility. The concurrence fails to cite any case that allows a prosecutor to argue that a

testimony, a generic tailoring argument is objectionable with respect to voir dire comments by the venire because there is "no evidence that [the] defendant ha[d] actually" changed his demeanor in response to such supposed comments. *Mattson,* 122 Hawai'i at 336, 226 P.3d at 506 (Acoba, J., dissenting, joined by Duffy, J.).

Significantly, there is nothing in the record with respect to Respondent's demeanor during his testimony, or any confirmation that Respondent looked the jurors "in the eye" or, if he did, the nature of the gaze. But more to the point, the "action" of looking at the jury when questioned on the witness stand in and of itself is not an unnatural or extraordinary act and, thus, is " 'conduct as consistent with innocence as with guilt[.]' " *Mattson,* 122 Hawai'i at 326, 226 P.3d at 496 (quoting *Portuondo,* 529 U.S. at 79, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.)). To reiterate, "allowing a prosecutor ... to invite the jury to convict on the basis of conduct as consistent with innocence as with guilt," "would not only be improper, but would also disregard the truth-seeking purpose of trial[.]" *Id.* (internal quotation marks and citation omitted).[37]

It is also manifest that the prosecutor's comments regarding Respondent's manner of testifying transformed his presence at trial into an "automatic burden on his credibility," *Portuondo,* 529 U.S. at 76, 120 S.Ct. 1119, (Ginsburg, J., dissenting, joined by Souter, J.), inasmuch as attendance during voir dire was a reason advanced by the prosecution for the jury to treat his testimony as unbelievable. The prosecutor may permissibly cast doubt about the "substance" of a defendant's testimony by referring to specific evidence suggesting that the defendant engaged in tailoring. *Hemingway,* 528 A.2d at 748. However, the prosecutor cannot ask the "jury to infer the defendant's lack of credibility from the manner in which he presented his testimony[,]" *id.,* because that inference, "related only to the defendant's presence in the courtroom[,]" "burdens the constitutional rights of defendants," specifically the right to be present at trial, *Mattson,* 122 Hawai'i at 325–26, 226 P.3d at 495–96. Here, the inference that Respondent was not credible was not drawn from testimony, but from his rightful presence during voir dire.[38] *Cf. Hemingway,* 528 A.2d at 748 (holding as improper a prosecutor's generic tailoring ar-

---

defendant tailored his demeanor to conform to comments made by the venire during voir dire.

**37.** The concurrence asserts that this opinion "undercuts the basic principle of *Mattson*" inasmuch as the prosecutor's voir dire remark "could have aided a reasonable juror in assessing [Respondent's] credibility by providing an explanation for [his] demeanor on the stand." Concurring opinion at ———— — ————, 260 P.3d at 385. But because Respondent's eye contact is conduct "as consistent with innocence as with guilt," *Mattson,* 122 Hawai'i at 326, 226 P.3d at 495 (internal quotation marks and citation omitted), the prosecutor could not unfairly encumber Respondent's right to be present by urging the jury to construe the ambiguity against Respondent. *Portuondo,* 529 U.S. at 77, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.). Respectfully, it is the concurrence that misapplies *Mattson.* The argument proffered by the prosecutor does not relate to anything other than Respondent's demeanor inferred from his presence throughout trial.

**38.** The concurrence suggests that requiring counsel to note demeanor on the record, if to be used in a tailoring accusation, will result in "additional interruptions" during trial by counsel seeking to note for the record a witness's de-

meanor, and asserts that "some non-verbal cues" are "not susceptible to verbal description." Concurring opinion at ————, 260 P.3d at 382. If the argument is tied to a purported advantage the defendant gained via his presence at trial, the argument implicates the defendant's constitutional rights, which predictably may be raised on appeal. In that regard, the prosecution is free to choose to note the specific demeanor for the record or not, (as it would with respect to any evidence), knowing that the matter potentially may be an issue for appeal. As to "additional interruptions" from litigators and the courts, it appears that litigators and the courts frequently and correctly note behavior in the record without considering these to be significant "interruptions." *See State v. Kiese,* No. 29792, 125 Hawai'i 242, 2011 WL 682258, at *4 (App. Feb. 25, 2011), *cert. accepted* (July 29, 2011) ("Your Honor, if the record will reflect the witness is shaking his head."); *see also In re Doe,* 108 Hawai'i 144, 149, 118 P.3d 54, 59 (2005) ("Let the record reflect that [the court is] looking at the letter[.]"); *Schutter v. Soong,* 76 Hawai'i 187, 191–92, 873 P.2d 66, 70–71 (1994) ("And the record will reflect, [counsel], that you are yelling at the court."). Finally, if "non-verbal cues" are not subject to verbal description, it is unclear how the prosecution could verbally discuss such cues during closing argument to the jury.

gument that asked the jury to infer, without referring to any testimony, that the defendant lacked credibility because of the manner in which he presented his testimony).

The ICA concurrence quoted *People v. Edelbacher*, 47 Cal.3d 983, 254 Cal.Rptr. 586, 766 P.2d 1, 30 (1989), for the proposition that " 'prosecutorial comment in argument on an accused's courtroom demeanor . . . [was not prohibited where] the defendant has testified and put his credibility in issue.' " *Walsh*, 123 Hawai'i at 291, 231 P.3d at 1008 (Fujise, J., concurring (ellipsis and brackets in original)). In that case, the prosecutor stated during summation that the defendant, while testifying, did not "act emotionally, [the jury] saw him sitting on the witness stand, he didn't have any emotion." 254 Cal.Rptr. 586, 766 P.2d at 30. The California court concluded that "[c]omment on a defendant's demeanor as a witness is clearly proper[.]" *Id.*[39] However, *Edelbacher* did not involve any argument that the defendant was incredible because his demeanor resulted from the exercise of his right to be at trial. Because *Edelbacher* did not connect any comment on the defendant's demeanor with the defendant's presence during trial, it has no bearing on the issue here.[40]

## B.

As recounted, Petitioner argues that the prosecutor's reminder to the jury of the standard instruction on evaluating witness testimony during her "eye contact" argument was proper. However, that argument is unavailing because the standard jury instruction on witness testimony did not counteract the improper inference that Respondent was less credible because of his presence, inasmuch as the instruction "made no mention of the prosecutor's accusations of tailoring." *Daniels*, 861 A.2d at 821.

Because the prosecutor argued Respondent's trial presence when referring to the instruction, the jury could draw the conclusion that Respondent's "means and opportunity of acquiring information," as stated in the instruction, *see supra* note 27, included his presence throughout the trial. Similarly, in *Daniels*, the defendant failed to object to the prosecutor's improper tailoring comments during summation. 861 A.2d at 810. After the prosecutor's summation, the trial court instructed the jury it may consider, among other things, a witness's "means of obtaining knowledge of facts to which [he] testified," when judging the credibility of that witness. *Id.* at 812. Although the instruction was not "intended to signal to the jury that defendant's presence during trial was among the potential sources of his testimony[,]" the New Jersey Supreme Court noted that the charge did not cure the prosecutor's improper remarks. *Id.* According to

---

**39.** Similar to the ICA concurrence in *Walsh*, the concurrence maintains that counsel may comment on a criminal defendant's demeanor while on the stand, citing numerous cases that involve comment on a testifying defendant's demeanor. Concurring opinion at ———, 260 P.3d at 381–82. As noted, that general proposition is not disputed in the instant case. Additionally, the cases cited by the concurrence are plainly distinguishable because they do not involve any argument that the defendant's demeanor resulted from, or was tied to, being at trial. For example, *Patty v. State*, 242 Ala. 304, 6 So.2d 399, 400 (1942), involved the determination that the prosecutor's characterization of the defendant as a "hard man to get along with" who had a "high temper" and "bad disposition" was based on the "appearance of the defendant as a witness in his own behalf" and "was a proper observation and the subject of argument to the jury." However, the prosecutor did not link the defendant's "bad disposition" or "high temper" to his presence during trial. Thus, *Patty*, and the cases cited by

the concurrence, have no relevance to the case at hand.

**40.** The prosecution may comment on the defendant's testimonial demeanor at trial. *See Edelbacher*, 254 Cal.Rptr. 586, 766 P.2d at 30 (allowing comment on defendant's testimonial demeanor); *see also Schuler*, 813 F.2d at 981 n. 3 ("When a defendant chooses to testify, a jury must necessarily consider the credibility of the defendant[, and] courtroom demeanor has been allowed as one factor to be taken into consideration."); *Good v. State*, 723 S.W.2d 734, 736 (Tex.Crim.App.1986) ("Admittedly, appellant's demeanor during his own testimony was properly in evidence by the mere fact that it was a part of his sworn testimony."); *contra State v. Smith*, 91 Hawai'i 450, 460, 984 P.2d 1276, 1286 (App.1999) ("Unless and until [the defendant's non-testimonial] reaction during the trial was lawfully introduced as evidence, it was not a proper subject for argument to the jury.").

**294**

that court, the trial court's failure to give an adequate curative instruction was plain error that "raised a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *Id.* (internal quotation marks and citation omitted).

The court in the instant case also told the jury, albeit prior to the closing arguments, that the jury may consider the "witness'[s] means and opportunity of acquiring information[,]" when assessing credibility. Because the jury was instructed to consider a witness's "means" and "opportunity" of obtaining information, the charge "did not cure the prosecutor's comments." *Id.* In light of the standard instruction on witness testimony, and to mitigate what may be a jury's "natural and irresistible" inclination to "have in mind and weigh in the balance" that the defendant heard the testimony of others who preceded him, *Portuondo*, 529 U.S. at 67–68, 120 S.Ct. 1119, "instructions that explain the necessity, and the justifications, for the defendant's attendance at trial[ ]" should be given whenever the defendant testifies to inform the jury that the defendant had a right and legal duty to be present at trial, *id.* at 76, 120 S.Ct. 1119 (Stevens, J. concurring, joined by Breyer, J.) (explaining that states and trial judges have the power to provide juries with such instructions).[41]

▪▪▪ Additionally, in *Daniels* the trial court instructed the jury that "[a]ny arguments, statements, remarks in the opening or summations of counsel are not evidence and must not be treated by you as evidence." 861 A.2d at 812. The New Jersey Supreme Court concluded that "[t]his charge properly reminded the jury to differentiate argument from evidence, but the court made no mention of the prosecutor's accusations of tailoring[,]" and, therefore, the charge "did not cure the prosecutor's [tailoring] comments." *Id.* In the instant case, the jury was similarly instructed that "[s]tatements or remarks made by counsel are not evidence." [42] Likewise, as in *Daniels*, this instruction would not remedy the lack of a curative instruction. *See State v. Espiritu*, 117 Hawai'i 127, 143–44, 176 P.3d 885, 901–02 (2008) (noting that the failure to correct a prosecutor's misstatement of the law in final argument may result in reversal of the defendant's conviction).

▪▪▪ In *Daniels*, because the failure to give an adequate curative instruction amounted to plain error, the case was remanded for a new trial. 861 A.2d at 810. Similarly, as a jury may draw the improper and unreasonable inference that a defendant who testified may lack credibility simply because the defendant was present at trial, such an instruction is warranted whenever a

---

41. The concurrence maintains that such an instruction should be given only when the defense requests it, because where the prosecutor does not make tailoring arguments, the instruction "would needlessly emphasize to the jury that the defendant's presence at trial creates a tactical advantage." Concurring opinion at ——, 260 P.3d at 386. However, if it is "natural" for a jury to draw "adverse inferences from a defendant's presence[,]" *Portuondo*, 529 U.S. at 84, 120 S.Ct. 1119 (Ginsburg, J., dissenting, joined by Souter, J.), the jury must be "instructed *not* to draw [such inferences,]" *id.* at 84–85, 120 S.Ct. 1119 (emphasis added), in order that the jury's understanding of the trial process is a correct one. Furthermore, this court has rejected similar assertions that instructions be given at the behest of the parties' "tactical or strategic reasons[.]" *State v. Haanio*, 94 Hawai'i 405, 414, 16 P.3d 246, 255 (2001) (rejecting the assertion that a lesser-included offense instruction should be given only upon request). A contrary approach "impairs the truth seeking function of the judicial system[,]" *id.*, because juries may improperly have in mind and weigh in the balance a defen-

dant's presence when assessing "criminal liability" in the absence of such an instruction. *Id.*

Moreover, "the trial courts, not the parties, have the duty and ultimate responsibility to insure that juries are properly instructed[.]" *Id.* at 415, 16 P.3d at 256. Party "tactics" must give way to the "broader interests" and governing principles described above. *Id.* at 414, 16 P.3d at 255; *cf. State v. Pond*, 118 Hawai'i 452, 467, 193 P.3d 368, 383 (2008) (holding that, the requirement that the parties provide reasonable notice before trial of the evidence intended to be introduced at trial of other crimes, wrongs, or acts, "protects parties and the jury trial system from falling prey to opposing counsel's trial tactics and strategies that do not promote a fair trial"). Finally, requiring the instruction potentially precludes future error, such as the error that occurred in the instant case.

42. *See* HAWJIC 3.03, which states in part that "[s]tatements or remarks made by counsel are not evidence. You should consider their arguments to you, but you are not bound by their recollections or interpretations of the evidence."

defendant testifies.[43] Hence, the jury should be instructed that a defendant has a constitutional right to be present throughout trial and while other witnesses are testifying, and that the jury must not draw any unfavorable inference regarding the credibility of the defendant's testimony simply on the basis of the defendant's presence at trial.[44] Consequently, on remand, if Respondent testifies, the court must give the jury such an instruction.[45]

Our holding does not hamstring the prosecution's ability to comment directly on the evidence presented. In that regard, the prosecution is free to refer to the specific inconsistencies and contradictions in a defendant's testimony or with other evidence, without referring to his presence at trial. Even in cases where there are no inconsistencies, the "close or perfect symmetry between a defendant's testimony and other witnesses' testimony, or other evidence of tailoring, may prompt the jury's scrutiny." *Daniels*, 861 A.2d at 820. Prosecutors may already cite to specific facts indicating a defendant's lack of trustworthiness; there is no reasonable justification for placing a tailoring burden on testimony.

## IX.

Petitioner's third argument maintains the prosecutor's comment that Respondent looked the jury in the eye was "an attempt by [the prosecutor] to discredit [Respondent] by the *manner* in which [Respondent] testified." (Emphasis in original.) But, as indicated *supra*, such a comment was improper because the suggestion that Respondent's demeanor was fashioned to conform with comments heard during voir dire amounted to an attack on Respondent's credibility on the basis of his trial attendance.

Furthermore, comment on the "manner" of testifying that rests on the defendant's being at trial should be prohibited. *See Hemingway*, 528 A.2d at 748. In *Hemingway*, the defendant, while testifying, gave two versions of the incident at issue, one that conformed to the testimony of a witness who had previously testified, and one that differed. In closing argument, the prosecutor stated that the defendant had "the opportunity, *unlike any other witness, to sit here and hear all the other evidence[,]*" had a chance to "fill in gaps[,]" and "modify testimony[,]" and urged the jury, upon review of the evidence, to "come back with a guilty verdict." *Id.* at 747 (emphasis added). The Vermont court noted that the prosecutor could have commented on the defendant's change in testimony, but the prosecutor "went beyond casting this doubt about the *substance* of the defendant's testimony, and asked the jury to infer the defendant's lack of credibility from the *manner* in

---

**43.** The requirement of such an instruction is also a salutary one inasmuch as a defendant charged with a felony is obligated to be present at all stages of trial, including "the impaneling of the jury." HRPP Rule 43(a). HRPP Rule 43 compounds the burden placed on the right to testify. In the absence of an instruction, mandated presence by court rule becomes a detriment to a defendant because the prosecution is otherwise free to impugn a defendant's credibility should he choose to testify. *See Mattson*, 122 Hawai'i at 345, 226 P.3d at 515 (noting that HRPP Rule 43 "compounds the burden" placed "on the right of confrontation[,]" and mandated presence would otherwise be a detriment to a defendant).

**44.** In that regard, "[o]nce all the evidence has been presented, it becomes the court's fundamental duty to properly instruct the jury on the law[.]" *Montalvo v. Lapez*, 77 Hawai'i 282, 291, 884 P.2d 345, 354 (1994). Indeed, as the "sole source of all definitions and statements of law applicable to an issue to be resolved by the jury[,]" the court has the duty "to see to it that the case goes to the jury [sic] in a clear and intelligent manner, so that they may have a clear and correct understanding of what it is they are to decide[.]" *State v. Hoey*, 77 Hawai'i 17, 38, 881 P.2d 504, 525 (1994) (internal quotation marks and citation omitted).

**45.** Other jurisdictions have required that an instruction regarding presence be given. *See State v. Rose*, 622 A.2d 78, 79 (Me.1993) (explaining to the jury, after defense counsel objected to the prosecutor's improper tailoring questions asked of the defendant on cross examination, that the defendant had "an absolute legal right afforded all defendants by law ... to be present through the entire trial"); *Elberry*, 645 N.E.2d at 43 (instructing the jury that the "defendant, who was a witness in this case, was here during the testimony of other witnesses, but he's got every right to be here," and "there is nothing untoward about the defendant being present when other witnesses are testifying"); *see also Hemingway*, 528 A.2d at 748 (stating that a cautionary instruction to disregard the improper tailoring remarks was necessary).

which he presented his testimony." *Id.* at 748 (emphases added).

Because "[t]here was no testimony that the defendant and [the witness] had collaborated, or that the defendant purposefully used the timing of his testimony to ensure his story coincided with that of [the witness,]" the inference that the defendant was not credible "was not drawn from the testimony, and was improper." *Id.* Similarly, in the instant case, the prosecutor's comment on Respondent's alleged manner in presenting his testimony, i.e., looking the jury in the eye, did nothing to "cast[ ] doubt on the substance" of Respondent's testimony, but erroneously urged that Respondent was less believable as a result of having been at voir dire. *Id.*

## X.

Petitioner's fourth argument, that the jury "likely did not summarily conclude that [Respondent] tailored his testimony" because the jury, during deliberations, inquired about Cooprider's location during the incident, is unpersuasive. According to Petitioner, the question shows that the jury "did not simply dismiss [Respondent's] testimony based upon an implication of tailoring, but properly weighed all of the evidence presented." First, this jury question is not determinative of whether a prosecutor's improper comments affect a defendant's substantial rights. Second, the question does not indicate whether the jury disregarded the improper tailoring comments or not. Rather, the jury question may indicate that the jury was considering whether Cooprider was credible; or the jury could have been questioning whether Cooprider had the best view of the incident, as opposed to Stephanie or other witnesses. In either instance, the prosecutor's comments on Respondent's credibility would have weighed improperly in the balance of the jurors' deliberations.

## XI.

Petitioner asserts in its fifth argument that, assuming the prosecutor's statements constituted misconduct, "the evidence against [Respondent]" was overwhelming and weighs against remanding for a new trial. To determine whether there is a reasonable possibility that the misconduct contributed to the conviction, this court considers (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.[46] *Mainaaupo,* 117 Hawai'i at 252, 178 P.3d at 18. Upon review, all three factors weigh in favor of Respondent.

### A.

As to the first factor, the nature of the misconduct, the effect of the misconduct is assessed.[47] To reiterate, in asserting that Respondent "benefitted" from hearing the testimony of other witnesses before he took the stand, and looked the jurors in the eye to establish credibility as a result of comments during voir dire, the prosecutor improperly argued that Respondent was not credible based on his presence throughout trial. When the misconduct attacks the credibility of the defendant, this factor has been weighed in favor of remanding for a new trial. For example, when the prosecutor "question[ed the defendant's] credibility" by wrongly asking the defendant on cross examination about "unsworn, unimpeachable statements allegedly attributable" to his brother, this factor weighed in favor of remand. *State v. Knight,* 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996). Similarly, when the prosecutor made the "illegitimate" and "unreason-

---

46. Respondent's counsel did not object to the misconduct at trial. "If defense counsel does not object at trial to prosecutorial misconduct, this court may nevertheless recognize such misconduct if plainly erroneous." *Wakisaka,* 102 Hawai'i at 513, 78 P.3d at 326. "Plainly erroneous" misconduct is that which affects the substantial rights of the defendant. *Id.* "In order to determine whether a defendant's substantial rights have been affected[,] the court must determine 'whether there is a reasonable possi-

bility that the error might have contributed to conviction.'" *State v. Murray,* 116 Hawai'i 3, 14 n. 9, 169 P.3d 955, 966 n. 9 (2007) (quoting *State v. Gonsalves,* 108 Hawai'i 289, 293, 119 P.3d 597, 601 (2005)).

47. Of course, as stated *supra,* the prosecution's summation infringed on several of Respondent's constitutional rights.

able" argument that the defendant was guilty because of his post-arrest silence, "[t]he nature of the [prosecutor's] conduct—the first factor—weigh[ed] in favor of granting [the defendant] a new trial." *Mainaaupo,* 117 Hawai'i at 254–55, 178 P.3d at 21. Also, when the prosecutor erroneously expressed her personal opinion as to the defendant's guilt and credibility, this error weighed in favor of remand. *State v. Marsh,* 68 Haw. 659, 660–62, 728 P.2d 1301, 1301–03 (1986).

Additionally, the statements diverted the jury from its duty to decide the instant case on the evidence, by "invit[ing] the jury to convict on the basis of conduct as consistent with innocence as with guilt[.]" *Mattson,* 122 Hawai'i at 326, 226 P.3d at 496 (internal quotation marks and citation omitted). Finally, the statements were also made during closing argument, a crucial part of trial.[48] The prosecutor argued that Respondent was not credible due to the exercise of his right to be present at trial, without referencing any specific evidence, "at a time when [Respondent] c[ould not] respond[,]" *id.,* with any evidence. In sum, this factor plainly weighs in favor of Respondent.

### B.

As to the second factor, the nature of the curative instruction, the court gave no curative instruction. Thus, this factor also weighs in Respondent's favor. *Wakisaka,* 102 Hawai'i at 516, 78 P.3d at 329 (finding that this factor weighs in favor of the defendant when no curative instruction was given even though defense counsel did not object).

### C.

As to the third factor, the strength of the evidence, when a prosecution's case against the defendant is not overwhelming but turns on the credibility of the defendant, it is likely that the error might have contributed to the conviction. *See State v. Pacheco,* 96 Hawai'i 83, 97, 26 P.3d 572, 586 (2001) (noting that, when acquittal or conviction turned on whether the jury credited the defendant's testimony or the state's evidence, the evidence was not overwhelming); *see also Marsh,* 68 Haw. at 661, 728 P.2d at 1302 (stating that the pivotal issue was the credibility of witnesses and in such a case it cannot be concluded that "the prosecutor's remarks had little likelihood of influencing this critical choice").

Cooprider testified that Respondent punched Kapena for no reason, whereas Stephanie, Lucy, and Respondent testified that Respondent was attempting to flee and to defend himself from the attackers. As the prosecutor stated in closing argument, "[t]he issue [was whether Respondent struck Kapena] in self-defense."[49] Cooprider's testimony, standing alone, does not present overwhelming evidence that there was no reasonable possibility that the "tailoring" error might have contributed to the conviction.

A jury is instructed to evaluate the weight and credibility of a witness's testimony, considering, among other things, "the extent to which the witness is supported or contradicted by other evidence[ .]" HAWJIC No. 3.09. At points, Cooprider's testimony was contradicted by the testimony of the prosecution's other witnesses, Kapena and Kepa, in addition to the testimony of Lucy, Stephanie, and Respondent. Cooprider testified that he noticed Kapena had his hands at his sides during his argument with Ilia. In contrast, Kapena testified that he "had [his] hands up[,]" and Lucy believed "the [male] had his hands like this (indicating), and he was explaining things, how would you talk to some-

---

48. The prosecutor did state that Respondent is entitled to "hear and see" the witnesses. However, this statement was undermined by the prosecutor's comment that followed, in which she stated, "But with that becomes the fact that [Respondent] benefitted from seeing all these witnesses." The reference to "hear and see" served only as the starting point to emphasize that, as a result of his presence, Respondent was not to be believed.

49. HRS § 703–304 (1993), the self defense statute, states in pertinent part as follows:
 **Use of force in self-protection.** (1) Subject to the provisions of this section and of section 703–308, the use of force upon or toward another person is justifiable when the actor *believes* that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.
 (Emphasis added.)

body, have your hands[ ]" in a "[y]elling kind of thing."

Cooprider indicated that Kapena was alone, whereas Kapena and Kepa explained that they were together. Cooprider also said that Respondent was "completely by him-self[,]" whereas Kapena, Kepa, Lucy, and Stephanie testified that Respondent was near Stephanie and Lucy during the incident.

Cooprider noted that Respondent came from a "commotion." However, Cooprider also testified that "security guards" were in-volved in the "commotion" and were "brush-ing people away[,]" "trying to get people to leave." In contrast, Kapena testified that there were no security guards in the area. Lucy testified she did not see any bouncers in the parking lot. Stephanie testified that no security guard, bouncer, police officer, or any individual assisted them.

Finally, Cooprider testified that Respon-dent "walked up [to Kapena in a] calm, cool, collective[ ][sic]" manner, which was seem-ingly inconsistent with the testimonies of Kapena, Kepa, Stephanie, and Respondent. Kapena confirmed that he recalled Respon-dent and Kala "wrestling on the ground." According to Kapena, Respondent and Kala were "fighting." Kepa stated that Respon-dent fought with Kala. Stephanie testified that Respondent, after being beaten in a corner, escaped and then fell "[s]teps away" from Ilia and Kapena, where he continued to be beaten while he was on the ground. Ac-cording to Stephanie, Respondent "stum-bled[,]" slipped out, and at that point, punched Kapena. Respondent testified that he was "crawl[ing] and stumbl[ing]" in an attempt to escape from his attackers. After he "crawled and stumbled" to the car, he "got up" and "just swung blindly[ ]" because he "was getting attacked." Cooprider also testified that Respondent had no marks on him from the fight, but Stephanie testified that he had "bumps on his face[,]" big lumps on "the back of his head" and a "black and blue[ ]" mouth from the blows he had re-ceived before he struck Kapena.

Thus, Cooprider's testimony concerning Respondent's demeanor and physical condi-tion contrasted sharply with the circum-stances related by the other witnesses. No one, not even Petitioner's other witnesses, except Cooprider, testified that Respondent was "calm, cool, and collect[ed]," and had no marks on him from the altercation. Coopri-der's testimony was "contradicted by other evidence," which raised an issue of whether his testimony was "worthy of belief." *See Black's Law Dictionary* at 423 (defining credibility as "[t]he quality that makes some-thing (a witness or some evidence) worthy of belief").

Finally, had the prosecutor not tied Re-spondent's credibility to his presence at trial, the jury "may well have harbored a reason-able doubt," *Pacheco*, 96 Hawai'i at 97, 26 P.3d at 586, of whether Petitioner had negat-ed the defense of self defense. *See State v. Van Dyke*, 101 Hawai'i 377, 386, 69 P.3d 88, 97 (2003) ("[O]nce the issue of self-protection is raised, the burden is on the prosecution to disprove the facts that have been introduced or to prove facts negativing the defense and to do so beyond a reasonable doubt." (Quot-ing *State v. Lubong*, 77 Hawai'i 429, 431, 886 P.2d 766, 768 (App.1994).)). Under the self defense statute, "the critical factor in deter-mining whether an actor's conduct is justified is the actor's state of mind or belief respect-ing facts and circumstances." Supplemental Commentary on HRS § 703–300 (1993). HRS § 703–304(1), governing the defense of self defense, provides in relevant part that "the use of force upon or toward another person is justifiable when the actor *believes* [[50]] that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion." (Emphasis added.)

With respect to this defense, *State v. Augustin*, 101 Hawai'i 127, 127, 63 P.3d 1097, 1097 (2002), noted that it was proper to instruct the jury to consider the defendant's self-defense claim "from the viewpoint of a reasonable person in [the defendant's] posi-tion under the circumstances of which [the

---

**50.** HRS § 703–300, which defines "bel means reasonably believes[,]" and applies the respect to justification for the use of force protection of property, and in the protection § 703–300 (quo-tation marks omitted).

defendant] was aware or as [the defendant] reasonably believed them to be[.]" In the majority's view, that defendant may only be "charged with 'knowledge' of those 'circumstances' of which he or she is actually 'aware.'" *Id.* at 128, 63 P.3d at 1098 (citing HRS § 702-206(2)(b) (1993)). Therefore, it is "error to judge the reasonableness of a defendant's viewpoint based on circumstances 'shown in the evidence' but of which the defendant is not 'aware.'" *Id.* (quoting *State v. Pemberton,* 71 Haw. 466, 477–78, 796 P.2d 80, 85 (1990)). Thus, a defendant's belief as to the surrounding circumstances of the incident is crucial to the defense.

▇▇▇ In this regard, Respondent's credibility was at the crux of his defense. The jury must "consider the circumstances as [the defendant] subjectively believed them to be at the time he tried to defend himself." *Id.* at 132, 63 P.3d at 1102 (brackets, quotation marks, and internal citation omitted). In doing so, of course, the jury is to decide whether the defendant was truthful about his subjective belief of the circumstances. Respondent testified he was aware that he was dazed, confused, stumbling, and under attack. He "swung blindly" "because he was getting attacked[.]" To determine whether it was "reasonable" for Respondent to act that way, the jury must assess Respondent's credibility.

*Pacheco,* 96 Hawai'i at 87, 26 P.3d at 576, where the defendant was charged with second degree escape, is instructive in this regard. There, the defendant attempted to run away from police officers, one of whom had allegedly "intimidated" the defendant in a previous encounter. *Id.* at 91, 26 P.3d at 580. The issue at trial was whether the defendant sought to escape as a means of avoiding custody, which would support the charge, or to avoid assault by the police officer, which would not support the charge. *Id.* at 97, 26 P.3d at 586.

As to the strength of the evidence, this court "observe[d] that whether the prosecution succeeded in establishing that [the defendant] possessed the requisite state of

mind at the time he fled ... hinged entirely upon whether the jury believed or disbelieved [the defendant's] testimony and, thus, depended upon winning a credibility contest." *Id.* at 96, 26 P.3d at 585. According to this court,

> had the jury believed [the defendant's] testimony, it may well have harbored a reasonable doubt as to whether [the defendant] had possessed the state of mind requisite to committing the offense of second degree escape. As such, ... we cannot say that the evidence against [the defendant] was so overwhelming *as to render the [prosecutor's] personal disparagements of him and vigorous and improper attack on his credibility harmless beyond a reasonable doubt.*

*Id.* at 97, 26 P.3d at 586 (emphasis added).

Similarly, in the instant case, but for the prosecutor's "improper attack on his credibility[,]" *id.,* the jury could have found that Respondent reasonably believed he was under continuous attack and acted to defend himself, raising a reasonable doubt as to whether Petitioner had disproved Respondent's defense of self defense beyond a reasonable doubt. In short, like *Pacheco,* the evidence was not so overwhelming so as to overcome the prosecutor's statements, which served to discredit Respondent and bolster the credibility of the prosecution's witnesses. Therefore, all three factors weigh in Respondent's favor and there is a reasonable possibility that the error might have contributed to the conviction. *State v. Maluia,* 107 Hawai'i 20, 24, 108 P.3d 974, 978 (2005).

### XII.

For the foregoing reasons, the ICA's June 10, 2010 judgment is affirmed, and the case is remanded to the court for a new trial in accordance with this opinion.[51]

RECKTENWALD, C.J., Joined By NAKAYAMA, J., Concurring In The Result.

I concur in the result. I agree with the majority that the prosecutor's statement that

---

51. Because the ICA majority is affirmed and the case is remanded for a new trial, the ICA's decision that any question about the restitution order need not be addressed is also affirmed. As a new trial is warranted, the restitution order is vacated.

respondent/defendant-appellant Timothy Walsh "benefitted from seeing all [the] witnesses" was an improper generic accusation of tailoring, and that Walsh's conviction must accordingly be vacated. However, I respectfully disagree with the majority's conclusion that the prosecutor's additional comments regarding Walsh's presence during voir dire also were improper. Finally, I believe that an "unfavorable inference" instruction relating to the defendant's presence at trial should be given only when the defense requests it, rather than in all cases in which the defendant testifies.

The State charged Walsh with Assault in the Second Degree, in violation of HRS § 707–711(1)(b). The charge was based on Walsh's involvement in a physical altercation with several men outside of a night club, where he punched and severely injured Kapena Kramer (Kapena). At trial, Walsh admitted punching Kapena, but argued he did so in self-defense. During closing argument, the prosecutor, after discussing the credibility and trial demeanor of Walsh's sister Stephanie, went on to say:

> Some of you during voir dire and jury selection were asked about what you would look at, and the defense went into great detail. Remember one thing that was asked by me to [Walsh]? You know, [Walsh], first of all, is entitled, since he's on trial here, is entitled to hear and see all the witnesses. But with that becomes [sic] the facts [sic] that he's benefitted from seeing all these witnesses. Before he got up on that stand, he saw each and every one of the witnesses, heard what they were going to say.
>
> What's important about that is not only that, he heard the voir-diring your questions, which some of you had mentioned, I believe you said, well, you know, if they looked me in the eye. Okay, so he gets up here and looks each one of you in the eye. See how sincere I am? Does that mean you're sincere? Well, what about, you know, Kepa got up there, and he was nervous. Remember Iokepa and Kapena, they had never been in trouble before and never testified before. They get up here. They were nervous. Yeah, think about it.

> You have to come up here for the first time in this kind of atmosphere, you're going to be nervous.
>
> . . . .
>
> But the fact of the matter is it is important that when the Court has read you those instructions about, I believe it's Instruction Number 7, about the credibility of witnesses, yes, you take into consideration all those items such as their appearance and demeanor, their manner of testifying, the intelligence, candor and frankness, the lack thereof, the interest in bias and motives for testifying, the opportunity for acquiring information, the probability or improbability of the witness' testimony, the extent to which a witness is supported or contradicted by other evidence and supported the extent to which a witness gave contradictory statements and whether at trial or at other times and all other circumstances surrounding it.
>
> But don't get fooled into a position where because somebody can look you in the eye, they must be telling the truth. If you know how to look somebody in the eye, you still can lie. If we look at the independent witnesses John Cooprider, what axe did he have to grind? What does he tell you? It corroborates everybody's testimony, even corroborates even [Walsh's] own testimony. What does John say? He's sitting there. He watches [Walsh], not, oh, crawling on the ground getting up. I'm sorry if you think, well, why is she making light of that. Because this evidence doesn't support it. Because that's a story. That's exactly what it is. It's [Walsh's] story, because he wants to try to make you believe he was out of his mind and doesn't know what he was doing and he just blindly reached out.

The defense did not object, and did not respond directly to the remarks during its own closing. The prosecutor did not mention Walsh's presence at trial during the rebuttal closing.

I agree with the majority that the reference to Walsh having "benefitted from seeing all these witnesses" was an improper generic tailoring accusation, *State v. Mattson*, 122

Hawai'i 312, 226 P.3d 482 (2010), and that the error was not harmless. Accordingly, Walsh's conviction must be vacated and the case remanded for a new trial.

Because that issue is dispositive, the court need not reach the prosecutor's comments regarding voir dire. In any event, the remarks did not constitute an improper generic tailoring argument under *Mattson*, and were not otherwise improper. Thus, I respectfully disagree with the majority's analysis of that issue.

The comments were made in the context of a larger argument regarding the credibility of the witnesses, and in particular, their demeanor while testifying. The prosecutor noted that some of the jurors stated during voir dire that they would consider whether a witness looked them in the eye in determining whether that witness was credible.[1] The prosecutor further argued that Walsh looked at the jurors during his testimony, and then sought to dispel the notion that the jurors should accordingly find Walsh's testimony credible, by (1) suggesting that Walsh may have testified in that manner in order to appear sincere, and (2) comparing Walsh's demeanor on the stand to that of the State's witnesses. In particular, the prosecutor contrasted Walsh's demeanor with those of prosecution witnesses Kapena and his brother Iokepa Kramer, whom she characterized as understandably nervous.

This portion of the prosecutor's closing was proper and did not constitute the type of generic tailoring accusation that was prohibited by *Mattson*. Rather than undercutting the jury's truth-seeking function, the argument furthered that function by properly focusing the jury's attention on an aspect of the defendant's demeanor (his looking at the jurors as he testified) and providing an explanation that was based on more than his mere presence at trial. For his part, the defendant could rebut that argument during his own closing, by suggesting that his demeanor was in fact sincere, by contrasting it to the demeanor of other witnesses, or otherwise. Respectfully, I believe that the jury's truth-seeking function is furthered, rather than hindered, by this adversarial testing, and that the defendant's right to be present during trial is not unduly burdened as a result.

In reaching that conclusion, three questions must be answered: 1) whether, as a general matter, prosecutors are entitled in closing to discuss the demeanor of a testifying defendant; 2) whether, in closing argument, prosecutors may refer to statements made during voir dire; and 3) whether the comments here nevertheless constituted an improper generic tailoring accusation prohibited by *Mattson*.

---

1. The record does not contain the transcript of the voir dire. The majority suggests that because there was no transcript, there is "no verification of what was said by potential jurors with respect to eye contact," and the prosecutor therefore impermissibly commented on matters outside the record. Majority Opinion at ———— , 260 P.3d at 368–69. Respectfully, the absence of the transcripts cannot support that conclusion, since the responsibility of providing the voir dire transcripts rested with Walsh, the appellant. Hawai'i Rules of Appellate Procedure (HRAP) Rule 10(b)(1)(A) ("When an appellant desires to raise any point on appeal that requires consideration of the oral proceedings before the court or agency appealed from, the appellant shall file with the appellate clerk ... a request or requests to prepare a reporter's transcript of such parts of the proceedings as the appellant deems necessary that are not already on file."); *Ek v. Boggs*, 102 Hawai'i 289, 292 n. 3, 75 P.3d 1180, 1183 n. 3 (2003) ("Inasmuch as Ek has failed to include transcripts of the February 3, 1999 evidentiary hearing regarding the prefiling order, we will not address any contention regarding the lack of evidence supporting the order.") (citing HRAP 10(b)(1)(A)). Walsh did not provide the requisite transcripts for the appellate record. In any event, in his appellate briefing, Walsh did not dispute the State's characterization of the statements made during the voir dire proceedings.

The majority concludes that Walsh was not responsible for providing the transcripts of the voir dire because Walsh contended at the ICA that they were not "necessary" to him on appeal. Majority Opinion at ———— n. 32, 260 P.3d at 368–69 (quoting HRAP Rule 10(b)(1)(A)). However, to the extent Walsh deemed the transcripts unnecessary, it was because, as he acknowledged in his reply brief to the ICA, he did not dispute the DPA's description of the voir dire: "Walsh is not contesting 'the factual basis for the prosecutor's comments' that some jurors said they would look at whether a witness looked them in the eye in judging his or her credibility." Thus, the majority's position that "there is no verification of what was said by potential jurors[,]" Majority Opinion at ——— ——, 260 P.3d at 369, is contrary to Walsh's own position.

As to the first issue, the starting point is the basic proposition that jurors may consider a witness's manner and demeanor on the stand in assessing his or her credibility. *State v. Apilando,* 79 Hawai'i 128, 131, 900 P.2d 135, 138 (1995) (" 'The right of confrontation affords the accused *both* the opportunity to challenge the credibility and veracity of the prosecution's witnesses and an occasion for the jury to weigh the demeanor of those witnesses.' ") (citation omitted) (emphasis in original); Hawai'i Pattern Jury Instructions–Criminal, Instr. 3.09. The jury here was so instructed. Instructions to the Jury at # 7, *State v. Walsh,* Cr. No. 08–1–0418(3) (Hawai'i 2d Cir. Jan. 26, 2009) ("In evaluating the weight and credibility of a witness's testimony, you may consider the witness's appearance and demeanor; the witness's manner of testifying. . . .").

Although Hawai'i courts have not decided, in a published opinion, whether counsel may comment on a criminal defendant's demeanor while on the stand, other jurisdictions have answered the question in the affirmative. *E.g., People v. Edelbacher,* 47 Cal.3d 983, 254 Cal.Rptr. 586, 766 P.2d 1, 30 (1989) ("Comment on a defendant's demeanor as a witness is clearly proper[.]"); *see also Patty v. State,* 242 Ala. 304, 6 So.2d 399, 400 (1942) (holding that the prosecutor's characterization of the defendant as a "hard man to get along with" and "a man of high temper and bad disposition" was proper comment on the defendant's manner of testifying); *State v. Fogg,* 80 N.H. 533, 119 A. 799, 801 (1923) ("The respondent's appearance on the witness stand and manner of testifying were legitimate matters for the consideration of the jury, bearing on his credibility, and therefore proper subjects of comment."); *Commonwealth v. Parente,* 294 Pa.Super. 446, 440 A.2d 549, 554 (1982) ("[T]he reference of the prosecution to the arrogance of appellant was not reversible error in that this comment referred solely to the demeanor of appellant on the stand."); *Good v. State,* 723 S.W.2d 734, 736 (Tex. Crim.App.1986) ("During jury argument, a party may allude to a *testifying* witness' demeanor if the jury had an equal opportunity to observe the witness .") (emphasis in original).

The majority notes that "there is nothing in the record with respect to [Walsh's] demeanor during his testimony, or any confirmation that [Walsh] looked the jurors 'in the eye' or, if he did, the nature of his gaze." Majority Opinion at ——, 260 P.3d at 371. However, the defendant's demeanor on the stand is information which both the jury and counsel were able to observe at trial and which the jury can appropriately consider as evidence in its deliberations. As the Court of Criminal Appeals of Texas aptly observed:

> [The defendant's] *demeanor during his own testimony* was *properly in evidence* by the mere fact that it was a part of his sworn testimony. We can presume that the jury had an equal opportunity to observe his demeanor. Therefore, [defendant's] testimonial demeanor could be alluded to by the State in final argument on guilt.

*Good,* 723 S.W.2d at 736–37 (emphasis added).

Likewise, many other jurisdictions characterize nonverbal conduct on the witness stand as "evidence." *United States v. Modica,* 663 F.2d 1173, 1180 (2d Cir.1981) ("A prosecutor is free to comment upon the evidence, including demeanor."), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *Chan v. Yates,* No. CV 07–729–DSF (OP), 2010 WL 517906, at *10 (C.D.Cal. Feb.8, 2010) ("[T]he prosecutor's comments neither mischaracterized nor assumed facts not in evidence, but merely commented on *the evidence—in this case the demeanor of the two testifying witnesses—*and made permissible inferences from their demeanor.") (emphasis added) (citing *Allen v. Woodford,* 366 F.3d 823, 841 (9th Cir.2004), *amended and superseded on other grounds by,* 395 F.3d 979 (9th Cir.2005)); *Florez v. United States,* No. 07–CV–4965 (CPS), 2009 WL 2228121, at *19 (E.D.N.Y. July 24, 2009) ("[The prosecutor's] comment on a witness's demeanor and conduct during his examination is hardly based on extraneous evidence."); *United States v. Carroll,* 34 M.J. 843, 845 (A.C.M.R.1992) ("However, *a witness ' demeanor is evidence. United States v. Felton,* 31 M.J. 526, 534 (A.C.M.R.1990). As such, it is not an improper subject of

comment. Here, the trial counsel's remarks reflected an incident during [the appellant's] cross-examination[.]") (emphasis added); *State v. Gilberto L.*, 292 Conn. 226, 972 A.2d 205, 219–20 (2009) (holding that prosecutorial comment on a complaining witness's demeanor was proper because her "*behavior while she was testifying* was not only *visible to the jurors* but was properly *before them as evidence* of her credibility.") (emphasis added); *People v. Nitz*, 143 Ill.2d 82, 157 Ill.Dec. 431, 572 N.E.2d 895, 912 (1991) ("[I]t is a *fair comment on the evidence* to argue that a *witness is believable because of her demeanor while testifying* and because her testimony was corroborated.") (emphasis added); *Watkins v. Commonwealth*, No.2008–SC–000177–MR, 2009 WL 4251785, at *5 (Ky. Nov.25, 2009) ("Although the prosecutor certainly strayed onto thin ice by [stating that the complaining witness told the jurors the truth], ... given the emphasis the prosecutor placed on *the comment's evidentiary basis, i.e., [the complaining witness's] demeanor on the witness stand*, we cannot say that the comment amounted to a palpable error rendering Watkins's trial manifestly unjust.") (emphasis added); *People v. Wesson*, No. 204305, 1999 WL 33453956, at *2 (Mich.Ct. App. Feb.23, 1999) ("[T]he *prosecutor's comments about* the credibility and *demeanor of one of its witnesses* was permissible *argument based on the evidence*.") (emphasis added); *Dodd v. State*, 100 P.3d 1017, 1044 (Okla.Crim.App.2004) ("[The prosecutor's] *comment on the confrontational demeanor of Appellant's former cellmate as a witness*, his references to the crime-scene photographs, and his implication of Appellant in the burglary of the victims' apartment, these were all *reasonable inferences from the guilt-stage evidence*, and were not objected to by the defense.") (emphasis added). Non-verbal conduct on the witness stand, therefore, can properly be the basis of closing argument.

The majority acknowledges that "comment on testimonial demeanor is entirely proper", Majority Opinion at —— n. 36, 260 P.3d at 370 n. 36, but appears to propose that counsel should note testimonial demeanor on the record if counsel plans to use it in a tailoring accusation "which predictably may be raised on appeal[,]" Majority Opinion at —— n. 38, 260 P.3d at 371 n. 38; *see also* Majority Opinion at —— n. 39, 260 P.3d at 372 n. 39 (distinguishing cases which held that comments on testimonial demeanor are proper on the grounds that these cases did not involve arguments linking the defendant's demeanor to his presence during trial). Respectfully, such a rule is unduly restrictive. Trial lawyers will be compelled to ask the court, in the midst of testimony, to note observations of demeanor which may possibly be useful in summation. Moreover, such descriptions are likely to be met with objections and counter-descriptions from opposing counsel. Finally, even disregarding the additional interruptions, some non-verbal cues, such as distinctly uncomfortable appearance, are not susceptible to verbal description.

In the instant case, the prosecutor commented on Walsh maintaining eye contact with the jury during his testimony. Walsh has not objected to this characterization of his demeanor on the stand. Although Walsh's eye contact was not noted by the court in the record, it was testimonial conduct that occurred on the witness stand, and that all of the jurors and counsel had the opportunity to observe. Thus, it was evidence in the case and the prosecutor was entitled to discuss it during summation.

The next inquiry is whether, in commenting on the defendant's testimonial demeanor, prosecutors may refer to statements made during voir dire. I agree with the majority that statements made in voir dire are not "evidence" in the sense that the State may not rely on such statements in place of providing factual proof during the evidentiary phase of the trial. However, the use in summation of analogies, illustrations, and the jurors' common experience to make the legal and factual concepts at trial understandable to a lay jury can be appropriate even though such matters are not in evidence. *U.S. v. Biasucci*, 786 F.2d 504, 513 (2d Cir.1986) (holding that the prosecutor's use of an "iceberg" metaphor was proper where it was used to describe the "structure of the loansharking operation: the 'tip' of the 'iceberg' being the business front, and the submerged segment, concealed from view, representing the rest of the enterprise"); *Scott v. Shelton*,

295 F.Supp.2d 1244, 1252–53 (D.Kan.2003) ("The prosecutor merely suggested that the jury use its common experience to consider what impact (if any) the trauma [resulting from sexual abuse] might have had [on the complaining witness's memory]."); *State v. Jones*, 197 Ariz. 290, 4 P.3d 345, 361 (2000) ("The prosecutor, by referring to famous serial killers[, Ted Bundy and John Wayne Gacy], did not introduce evidence completely outside the realm of the trial, but rather drew an analogy between [the defendant's politeness] at trial and that of [the] well-known murderers [to indicate that politeness did not indicate innocence]."); *People v. Friend*, 47 Cal.4th 1, 97 Cal.Rptr.3d 1, 211 P.3d 520, 549 (2009) ("The prosecutor's use of the golf analogy in his rebuttal was permissible. As we have held, prosecutors are entitled during summation to state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history, or literature.") (footnotes, internal brackets and quotation marks, and citation omitted); *State v. Kell*, 61 P.3d 1019, 1033, 1033 n. 11 (Utah 2002) ("While it is true that a prosecutor is not permitted in a closing argument to allude 'to matters not introduced as evidence at trial,' [the prosecutor's recounting of childhood stories] in this case [was] offered not as new factual matter, but simply as illustrations to make a conceptual point.") (citation omitted).

Such arguments are improper when they go beyond the common experience of the jury and, for example, misstate the law or purport to establish factual matters which are part of the State's burden of proof. *See, e.g., People v. Katzenberger*, 178 Cal.App.4th 1260, 101 Cal.Rptr.3d 122, 128 (2009) (holding that the prosecutor's use of a jigsaw puzzle illustration to explain the concept of reasonable doubt was improper, inter alia, because it likely misled the jury into believing that reasonable doubt is a quantitative inquiry and that the jury may find guilt where the state made a 75% showing); *Hamilton v.*

*State*, 79 Okla.Crim. 124, 152 P.2d 291, 294, 295–96 (Okla.Crim.App.1944) (holding that the prosecutor in a horse theft case could not state in closing that the testimony in that case and in two related cases which were not in the record indicated that the defendants in the three cases alternately blamed each other for theft); *cf. State v. Simmons*, 292 Kan. 406, 410, 254 P.3d 97 (2011) (holding that the prosecutor improperly told the prospective jurors during jury selection to view the kidnapping and rape case "in light of the Stockholm Syndrome[,]" because 1) there was no evidence regarding the syndrome in general, 2) the jury may have been mislead into believing that the syndrome is a recognized medical term with a settled meaning, and 3) the comment implied that the prosecutor "was an authority on the Stockholm Syndrome and was capable of diagnosing [it]").

Consistent with these general principles, where statements in voir dire reflect the common experience of the jurors, prosecutors are entitled to refer to the statements in summation. *Glymph v. U.S.*, 490 A.2d 1157, 1161 (D.C.1985) (the prosecutor did not engage in misconduct when she referred in summation to the fact that none of the jurors in voir dire responded in the affirmative to her question whether physical violence should be expected in an intimate relationship); *State v. Danback*, 886 S.W.2d 204, 209 (Mo.App.1994) (the prosecutor properly drew on the "common experiences" of the jurors by referring in closing to a number of women having stated during voir dire that they either have been raped or knew someone who was raped and that these instances were not reported); *State v. Davis*, 116 Ohio St.3d 404, 880 N.E.2d 31, 50–51, 84–85 (2008) (holding that the prosecutor permissibly referred to a hypothetical which the prosecutor used in voir dire, where the reference in summation was "a means of explaining that the jury should give little weight to [the defendant's disadvantaged] background").[2]

---

**2.** Georgia courts have held that remarks in closing argument regarding voir dire are generally improper. *Sterling v. State*, 267 Ga. 209, 477 S.E.2d 807, 812 (1996) (holding that the prosecutor improperly argued matters outside of the evidence by stating in closing that the defendant's question in voir dire regarding whether venire persons believed that sometimes the guilty must go free was a concession of guilt, but holding that the remark was harmless); *Joseph v. State*, 231 Ga.App. 399, 498 S.E.2d 808, 811 (1998) (holding that the prosecutor improperly commented on matters outside of the evidence by arguing that the case was not about race and that

Similarly, the DPA here referred to jurors' statements which reflected their common experience and knowledge. According to the DPA, some jurors indicated that eye contact would be an indicia of credibility. The use of eye contact as a measure of credibility derives from common knowledge and experience. It is something to which all jurors can relate and which cannot be characterized as misleading.[3] Significantly, the DPA was not attempting to use the voir dire to establish a factual point which the State had to prove at trial. *Cf. Hamilton*, 152 P.2d at 294, 295–96 (holding that the prosecutor in a horse theft case could not state in closing that defendants in two related cases, which were not in the record, indicated that the present defendant engaged in theft). Thus, this is not the type of information which the DPA should have to enter into evidence before using in summation.

Therefore, the majority's position that the DPA's comment regarding what occurred at voir dire was improper cannot be justified by the proposition that statements in voir dire are not evidence. Majority Opinion at —— ——, 260 P.3d at 369–71. Respectfully, the decisions cited by the majority are inapplicable in this case because none of them dealt with what counsel are allowed to discuss in closing argument. *See, e.g., United States v. Khoury*, 901 F.2d 948, 955 (11th Cir.1990) (holding that defendants were not entitled to have the entire jury panel struck where one juror said that her son had been charged with a crime and murdered in a drug-related incident and began to cry in the presence of the panel but where the trial court struck the

juror for cause and instructed the remaining jurors that statements made during voir dire were not evidence and had nothing to do with the case).

Lastly, I consider whether the comment was improper because it was tied to Walsh's presence at trial. This final inquiry is governed by this court's decision in *Mattson*. In that case, this court struck a balance between the protection of criminal defendants' constitutional rights and the avoidance of undue burdens on criminal prosecutions. *See id.* at 326–27, 226 P.3d at 496–97 (placing a "moderate and warranted" restriction on "general" tailoring accusations, while permitting "specific" accusations). *Mattson* set out a test to identify proper tailoring accusations from improper ones. *Id.* We noted that accusations which are "based only on a defendant's presence throughout the trial[,]" i.e., generic tailoring accusations, are improper. *Id.* at 326, 226 P.3d at 496. The prosecuting attorney's tailoring argument in *Mattson* was not generic, since the prosecutor referred to several pieces of information which supported the tailoring accusation. *See id.* at 327, 226 P.3d at 497. Namely, the prosecutor relied on Mattson's pre-trial statement which was inconsistent with his testimony at trial, as well as a 911 tape and the statements by two witnesses which also contradicted Mattson's testimony. *Id.* We held that the prosecutor's reference to this evidence "*in addition* to referring to Mattson's presence at trial" meant that the accusation was not "based *solely* on his presence at trial" and, therefore, was not improper.[4] *Id.* (emphasis in original).

defense counsel brought race into the case during voir dire, but holding that the remark was harmless). These cases, however, did not deal with voir dire statements which derived from the jurors' common experience and knowledge.

3. Although reasonable people may disagree as to whether some propositions derive from common experience, *e.g., compare Danback*, 886 S.W.2d at 209 (the prosecutor properly drew on the "common experiences" of the jurors by referring in closing to a number of women having stated during voir that they either have been raped or knew someone who was raped and that these instances were not reported) *with People v. Pitts*, 223 Cal.App.3d 606, 273 Cal.Rptr. 757, 816 (1990) (holding that the prosecutor could not

discuss in closing argument some prospective jurors' statements in voir dire about the frequency with which sexual abuse was reported in schools) *and United States v. Bettenhausen*, 499 F.2d 1223, 1233 (10th Cir.1974) (in a case charging defendants with making false statements on tax returns, holding that the prosecutor improperly referred in summation to prospective jurors' having indicated during voir dire that their experience with the Internal Revenue Service was not unpleasant), the use of eye contact as a measure of credibility is not such a proposition.

4. Although in *Mattson* we relied on the fact that the prosecutor pointed to other "evidence" of tailoring in the closing, we did not decide the question presented here, i.e., whether a prosecu-

Thus, on the one hand, we prohibited prosecutors from accusing criminal defendants of tailoring without reference to any facts supporting such an accusation. *Id.* at 326, 226 P.3d at 496. On the other hand, we clarified that, where the prosecutor supports a tailoring accusation with facts other than mere presence at trial, such an accusation will not be held improper. *Id.* at 327, 226 P.3d at 497. In the instant case, the voir dire remark is similar to the argument that we permitted in *Mattson.* As in *Mattson,* the prosecutor's argument here was not a bare accusation buttressed only by the fact that Walsh observed the voir dire. The argument was not of the form "He was here, therefore he tailored" which we prohibited in *Mattson.*

Rather, the prosecutor relied on two facts wholly separate from Walsh's mere presence: 1) that some jurors mentioned during the voir dire that eye contact would be an indicia of trustworthiness; and 2) that Walsh maintained eye contact during his testimony. Specifically, the DPA stated: "[S]ome of you had mentioned, I believe you said, well, you know, if they looked me in the eye. Okay, so he gets up here and looks each one of you in the eye." The jurors were present during Walsh's testimony, and could therefore assess whether the prosecutor's characterization matched their own recollection. They could also determine whether Walsh's demeanor on the stand—including any efforts on his part to make eye contact with them—was indicative of sincerity or pandering. In short, a reasonable juror could find this information useful in assessing Walsh's credibility.

Respectfully, precluding the prosecutor from making that argument does not advance the purpose of the prohibition against generic tailoring accusations. *See id.* at 326, 226 P.3d at 496 ("[G]eneric accusations of tailoring do *not* aid the jury in any way in determining whether a defendant has tailored his

testimony or simply related a true version of the events.") (emphasis in original). Indeed, the Majority Opinion undercuts the basic principle of *Mattson* by preventing prosecutors from aiding the jury in its "truth-seeking" function. *Id.* at 326, 226 P.3d at 496. Whereas "every defendant who testifies is 'equally susceptible' " to "a comment that is related *only* to the defendant's presence in the courtroom and not to his actual testimony[,]" the voir dire remark in the instant case instead referred to Walsh's actual testimony. *See id.* at 325, 226 P.3d at 495 (emphasis in original). As discussed *supra,* the remark could have aided a reasonable juror in assessing Walsh's credibility by providing an explanation for Walsh's demeanor on the stand. In sum, the accusation at issue here is not improper under *Mattson* because the prosecutor supported it by reference to matters other than Walsh's mere presence which the jury observed and was entitled to consider.

Moreover, this is not a case where the defendant had no opportunity to respond to the tailoring accusation. In *Mattson,* we expressed concern about allowing generic accusations "at a time when the defendant cannot respond" to them. *Id.* at 326, 226 P.3d at 496. In the instant case, since the voir dire remark came during the prosecutor's initial closing, defense counsel could have rebutted the argument in her own closing by disputing the prosecutor's characterization or by pointing, for instance, to aspects of Walsh's demeanor on the stand which supported trustworthiness, his testimony admitting unfavorable facts, or corroboration of his testimony by other evidence. Indeed, as the majority acknowledges, Majority Opinion at ——, 260 P.3d at 357, defense counsel did respond in her closing, arguing that Walsh was "upfront" about "having been drinking" and urging the jury not to "speculat[e]" or

tor may use the jurors' common experience in support of a tailoring accusation. *Mattson,* 122 Hawai'i at 327, 226 P.3d at 497. Moreover, we did not state that only evidence *which is noted in the record* can be used to make a proper tailoring argument. *Id.* The prohibition was against accusations which relied "solely" on presence at trial. *Id.* at 326, 226 P.3d at 496. As discussed *supra,* non-verbal demeanor on the witness stand con-

stitutes evidence. Moreover, prohibiting references to non-verbal testimonial communications would not advance the purpose of the prohibition against generic tailoring accusations. *See id.* ("[G]eneric accusations of tailoring do *not* aid the jury in any way in determining whether a defendant has tailored his testimony or simply related a true version of the events.") (emphasis in original).

reach a verdict by "looking at [Walsh] and thinking ... [that] the Kramer brothers looked a lot nicer[.]"

Finally, I believe that requiring the "unfavorable inference" instruction to be given in all cases where the defendant testifies, Majority Opinion at —— – ——, 260 P.3d at 373–74, may be counterproductive. Assuming the prosecutor avoids tailoring arguments, the instruction would needlessly emphasize to the jury that the defendant's presence at trial creates a tactical advantage. Accordingly, such an instruction should be given only if the defense requests it.